In re MAJOR FUNDING
CORPORATION, Debtor.

James ABLES, et al., Teofil Boata, K.P. Boromand and Rahad Rasnia, Monroe Corn and Vivienne Corn, Max T. Murray and Glenda Murray, Cleo Donald Tergensen, individually and as trustee for Michael D. Tergensen, Royse Shaddix, Jr. and Kerald Kit Shaddix, and Texas Investors Funding Movants,

v.

MAJOR FUNDING CORPORATION
and, Ron Sommers, Trustee
Respondent.

Bankruptcy No. 87–01026–H3–11.

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Nov. 6, 1987.

---

Michael T. Trefny, Lehmann & Associates, Houston, Tex., for James Ables, et al. and Max T. Murray and Glenda Murray.

John "Lee" Arellano, Houston, Tex., for Teofil Boata.

Thomas B. Greene, III, Crain, Caton, James & Womble, Houston, Tex., for K.P. Boroman and Rahad Rasnia.

Mary E. Staine, Woodard, Hall & Primm, Houston, Tex., for Monroe Corn and Vivienne Corn.

Ronald J. Sommers, Lackshin & Nathan, Houston, Tex., trustee.

Robert R. Truitt, Jr., Robert R. Truitt, Jr., P.C., Midland, Tex., for Cleo Donald Tergensen, Indv. and as Trustee for Michael D. Tergensen.

David T. Altenbern, Morris & Campbell, Houston, Tex.

Andrew M. Caplan, Houston, Tex., for Texas Investors Funding.

Richard Simmons, Lackshin & Nathan, Houston, Tex., for trustee.

## MEMORANDUM AND ORDER

LETITIA Z. CLARK, Bankruptcy Judge.

These eight motions for relief from the automatic stay were consolidated since they raise the same legal issues, although the facts of each are slightly different. Over 80 creditors are represented by these motions, all seeking a determination that certain mortgages assigned to them are not property of the Debtor's estate.

The Debtor, Major Funding Corporation ("Major Funding"), was in the business of mortgage brokering. Major Funding is currently the defendant in a state court lawsuit brought by the State of Texas in 1985 in favor of homeowners on mortgage violations. The State also intervened on

the question of securities violations on behalf of investors. The Debtor's operations may ultimately be determined in that suit to have been fraudulent. In the meantime, various creditors and the State of Texas, through the Attorney General, requested this Court to retain this case, believing administration of the Debtor's remaining assets pursuant to the Bankruptcy Code will provide a fuller and more equitable distribution to the many claimants to Debtor's assets, than would any form of administration available through the State of Texas Courts or its administrative bodies. On June 5, 1987, Ronald J. Sommers was appointed Chapter 11 operating trustee, due to the incompetence and gross mismanagement of the Debtor, and to protect the assets from being further consumed. As representative of the estate, the Trustee's role, among other things, is to collect all monies and other property which is property of the estate, and to propose a plan, within the requirements of the Bankruptcy Code, for equitable distribution of the assets he has collected to all allowed claimants to those assets.

To the extent any of the following findings of fact are construed as conclusions of law, they are hereby adopted as such. To the extent any of the following conclusions of law are construed as findings of fact, they are hereby adopted as such.

## FINDINGS OF FACT

In the typical transaction, a contractor such as Major United Steel Siding Corporation, a related entity, contracted with homeowners in the Houston metropolitan area for home improvements. The contractor loaned the homeowners the funds for these improvements, and in return received notes for the amount of the improvements, and received second lien deeds of trust to secure repayment. Major Funding purchased these mortgages at below face value.

In order to interest investors, Major Funding advertised its "mortgage investment plan" in the local media, and distributed brochures detailing its benefits. Investors were assured that, for a minimum $5,000.00 outlay, they would receive monthly interest payments, or the interest would be compounded. Interest rates were advertised at from 15 to 20 percent and higher, and were guaranteed never to drop below the initial rate. Investors were told that their investments were "secured" by assignments of homeowners' Contracts for Labor and Materials and Deeds of Trust, and that such assignments were properly recorded. Despite that purported assignment of a lien, Major Funding assured investors that it would continue to pay the investors their promised interest notwithstanding any default in homeowner payments on the underlying lien. In such a case, Major Funding would "repurchase" the lien from the investor, and assign a new performing note and lien. Similarly, if a homeowner paid up his account in full, Major Funding would assign another note and lien to the investor. These assurances were used to demonstrate a further assurance to the effect that the investment was essentially riskless.

The process of choosing a mortgage to assign to a particular investor varied widely. One investor chose his mortgages only after careful analysis that included searching the real property records and reviewing the homeowner's payment record. Most investors, however, did no analysis. Most liens were assigned by Major Funding personnel solely on the basis of value: a randomly chosen note and lien worth $5,000.00 would be assigned as "security" for a $5,000.00 investment.

The reverse side of the typical Contract for Labor and Materials and Deed of Trust carried an assignment of the lien and note to the investor. In most cases, the assigned deeds of trust were recorded in the real property records of the county where the homeowner's property was located. However, despite the valid assignment of the trust deeds, the corresponding notes were generally not indorsed and delivered over to the investors, but retained by Major Funding for "safekeeping."

Few investors had any sort of servicing agreement with the Debtor whereby the Debtor was contractually obligated to col-

lect on the homeowners' notes and remit payment to the investor. Movant Texas Investors Funding did have such an agreement with the Debtor, but that agreement lacked a central feature common to most servicing contracts: the Debtor was not obligated to forward the homeowner's payment to the movant. Consistent with Major Funding's routine, all note payments from the homeowners were commingled, and investors were paid monthly interest without regard to the performance of the investors' assigned notes.

Major Funding began its mortgage brokering operations in 1976. The company appears to have done well in the local economic boom of the early 80's, but when the economy took a downturn, Major Funding's irregular business practices came to light. In 1985, the State of Texas, through the Attorney General's Consumer Protection Division, filed a lawsuit against Major Funding in the 280th Judicial District Court, Harris County, Texas, on behalf of homeowners, alleging consumer credit violations, usury, deceptive trade and fraud. The State of Texas, through its Securities Division, intervened on behalf of investors. On May 29, 1986, the state court Judge Thomas R. Phillips signed an "Order on Intervention" ordering Major Funding in part to "assign to each investor a note secured by a lien, each complying with the Texas Consumer Credit Code." The Order also prohibited the Debtor from representing "to any investor or potential investor that Major Funding or 'we' shall pay to the investor an amount (or similar representation) as opposed to the investor receiving a yield from the note or notes and lien or liens that he obtains." An attorney for Major Funding signed this Order.

Apparently as a result of this Order, Jonathan Grant, then president of the Debtor, sent to each investor an undated memorandum titled "Important Notice." This notice is reproduced in full:

> To comply completely with the State Securities Board's request for compliance under Section 5J of the Securities Code, Major Funding is now assigned to all investors, in addition to the Deed of Trust, the original promissory note. Such assignment has already been completed.
>
> As an investor, you may either take possession of the original note or sign the enclosed safekeeping receipt and Major Funding will store the assigned note for you.
>
> The promissory note is the one document in the loan that cannot be reproduced or replaced, consequently the original must be returned to Major Funding at time of withdrawal. For that reason you may find it more convenient for Major Funding to maintain safekeeping.

Immediately prior to Major Funding's February 5, 1987 bankruptcy petition, and for some time thereafter, investors visited Major Funding's offices and requested possession of their note or notes. Many notes were turned over both prepetition and postpetition, and there was evidence that, prior to appointment of a trustee in this case, some investors received notes as a result of settlements after seeking relief from the automatic stay in this Court.

On the petition date, there were approximately 1,330 investors with roughly $50 million invested in Major Funding. Additionally, there were 656 Individual Retirement Accounts with a total of $6 million, and 14 Keogh accounts with $380,000.00. Also, only 1,100 of the investors with a total balance of $39 million had assigned notes. There were 3,774 homeowner accounts, representing $56 million. As of the petition date, 178 of the homeowners were involved in personal bankruptcies, and 375 had been involved in a foreclosure.

The motions for relief before the Court in the instant matters were filed by investors who occupied a variety of positions. The "James Ables, et al." motion is on behalf of some 80 investors, all of whom have recorded assignments of trust deeds. Some of these investors have possession of the original promissory notes, while some only have copies. Few of the promissory notes carry proper indorsements.

Movant Teofil Boata was assigned seven Contracts for Labor and Materials and Deeds of Trust over a period of two years.

Teofil Boata apparently never received the original notes. Movants Max and Glenda Murray are currently in possession of the indorsed, original homeowner notes, which they received postpetition. Movants Monroe and Vivienne Corn were assigned four Contracts for Labor and Materials and Deeds of Trust. Additionally, the Debtor executed an assignment of one Contract for Labor and Materials and Deed of Trust to Major Funding as trustee "FBO Monroe Corn, IRA." This assignment stated that no recourse was to be had against Major Funding for payment of the underlying obligation. The Corns have possession of three of the original promissory notes. The remaining notes may be in the possession of the Chapter 11 Trustee, but have not been located. According to the credible testimony of the accountant employed by the Trustee, the Debtor's records were poorly organized and, in many instances, missing completely. Mr. Jonathan Grant, former President of Debtor, was not available to testify, nor does it appear that his whereabouts are known. The prior President, Mr. Sorce, is reportedly in prison.

Royse and Kerald Kit Shaddix were assigned four liens, but do not have possession of the related notes. Cleo Donald Tergensen, individually, received four lien assignments from Major Funding and one lien assignment as trustee for Michael D. Tergensen, and is in possession of the original promissory notes, some of which are indorsed and some not.

Barton Lockhart, principal of Texas Investors Funding, was in the business of purchasing second liens. His relationship with Major Funding was unusual in that he exercised greater control over the choice of assigned liens than other investors and entered into the previously mentioned servicing contract with the Debtor. He was assigned 37 deeds of trust and at one point had possession of the corresponding notes. In fact, Mr. Lockhart testified that he contacted each homeowner in an attempt to begin receiving the homeowners' payments directly. Texas Investors also holds a promissory note executed by Major Funding and secured by a "pledge" of collateral memorialized in a "collateral agreement."

Texas Investors currently does not have possession of the original promissory notes.

Finally, movants K.P. Boromand and Rahad Rasnia received a promissory note and deed of trust executed by Major Funding. They were given possession of the corresponding note, but at the request of the Debtor, returned the note to Major Funding. It cannot now be located.

## CONCLUSIONS OF LAW

■ The movants argue that despite the lack of possession of the notes, they hold beneficial title to the assigned notes. They contend that pursuant to 11 U.S.C. § 541(d), their beneficial interest never became property of the estate and that the Debtor is under an obligation to turn over the notes. The Trustee, who is required by statute to attempt to gather into the estate all property to which it may be entitled, has properly sought a ruling of the Court on this question, by opposing the motions. Counsel for the Trustee argue that the funds invested with the Debtor were merely loans secured by assigned liens rather than sales of those liens. As a result, the Trustee argues that movants are unsecured creditors since possession is necessary to perfect a security interest in an instrument. Tex.Bus. & Com.Code § 9.304(a).

The test for creation of a security interest is whether "the transaction [was] intended to have effect as security." *Southern Rock, Inc. v. B & B Auto Supply,* 711 F.2d 683, 685 (5th Cir.1983) citing Tex.Bus. & Com.Code § 9.102 comment 1. As evidence of the intent of the parties, movants cite the following:

1) Debtor's advertising brochures and correspondence referred to the transaction as a purchase and sale, and described the investors as "owners" of the liens;

2) Postpetition counsel for the Debtor circulated letters to the investors giving them the option of "retain[ing] the loans *purchased* from Major Funding with the understanding that Major Funding will not be in a position to continue to *service* the accounts." (Emphasis added);

3) Debtor's settlement with individuals who had previously filed for relief from the stay by handing over the notes is evidence that Major Funding considered the transactions to be sales;

4) The Agreed Order on Intervention signed by counsel for the Debtor in the state court suit represents a judicial determination that the transactions in question were sales, and hence binding on this Court;

5) The Debtor's "Important Notice" that specifically assigned the notes to the investors, but urged investors to leave the notes in Major Funding's possession for "safekeeping."

However, Major Funding's business practices reveal the true intent of the Debtor. First, the investors were promised a set return on their investment regardless of the rate on the "assigned" note. The transactions lacked the direct pass-through of funds from homeowners to the investors that is characteristic of secondary mortgage transactions. Instead all funds were commingled in a single operating account. Second, in the event of default or full payout, Major Funding would "repurchase" the old lien and assign a new lien to the investor. Such practices indicate that the investors did not shoulder the normal risks of ownership. *In re S.O.A.W. Enterprises, Inc.*, 32 B.R. 279, 282 (Bankr.W.D.Tex. 1983); *but see In re Lemons & Associates, Inc.*, 67 B.R. 198, 209–10 (Bankr.D.Nev. 1986).

Analysis of the transfers of Contracts for Labor and Materials and Deeds of Trust into Individual Retirement Accounts, with the Debtor as trustee for a particular investor, presents the same outcome. Here again, it is important to note that the Debtor did not segregate the "trust" funds, but commingled such funds in a single IRA account.

Movants contend, however, that 11 U.S.C. § 541(d) shows a special deference to what might generally be considered sloppy business practice in the secondary mortgage market. They insist that Major Funding's physical retention of the notes is sanc-

tioned by the Code, and is not evidence of retention of equitable title in such notes.

Property of the estate includes all legal or equitable interests of the Debtor as of the commencement of the case. 11 U.S.C. § 541(a)(1). This concept is clarified, with specific reference to mortgages, in 11 U.S.C. § 541(d):

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

In enacting Section 541(d), Congress was reacting to the widespread practice in secondary mortgage transactions of brokers foregoing recordation and proper transfer of the mortgage documents for the sake of convenience. It had become common under the Bankruptcy Act for trustees to assert that such arrangements were loans and not sales. *See generally* Drake and Weems, *Mortgage Loan Participations: The Trustee's Attack*, 52 Am.Bankr.L.J. 23 (1978). The following legislative statement is illuminating:

> The purpose of section 541(d) as applied to the secondary mortgage market is therefore to make certain that secondary mortgage market sales as they are currently structured are not subject to challenge by bankruptcy trustees and that purchasers of mortgages will be able to obtain the mortgages or interests in mortgages which they have purchased from trustees without the trustees asserting that a sale of mortgages is a loan from the purchaser to the seller.

124 Cong.Rec. S17, 413 (daily ed. Oct. 6, 1978).

Section 541(d) creates a presumption that a secondary mortgage broker's retention of loan documents is a retention

of legal title only. The presumption may be rebutted, however, by a showing that the apparent sloppiness of the Debtor's operations was due to bad business or outright fraud, rather than being intentional in order to facilitate the operation of the business. *In re Fidelity Standard Mortgage Corp.*, 36 B.R. 496, 500 (Bankr.S.D.Fla. 1983). The Court finds that the irregularities in Debtor's operations were at best extremely poor business practices and were calculated to convince investors of the illusory "safety" of their investments rather than being a legitimate attempt to promote the secondary mortgage business. At worst, the Debtor's practices may eventually be determined to have been fraudulent. As a result, the Debtor's operations will not be deemed to be sanctioned by 11 U.S.C. § 541(d). *Lemons, supra,* 67 B.R. at 211.

Finally, in reviewing the Debtor's advertising and correspondence, the Court notes that the Debtor used the terms "secured" and "security" as frequently as the terms "sale," "purchase" or "owner."

Based on the evidence as a whole, and giving particular weight to the actual structure of the transactions, the Court finds that these transactions were not in fact sales, but loans by the investors, believed to be secured by interests in the notes.

■ Since the Court concludes that these transactions are loans rather than purchases, we now turn to the question of whether the movants have properly perfected their security interests. This is determined by reference to state law. As noted above, a security interest in a note may be perfected by possession only, Tex. Bus. & Com.Code § 9.304(a). A perfected assignment of the homeowner's liens gives the investors no right to collect payment without possession of the note. *Windham, et al. v. Citizens National Bank,* 105 S.W. 2d 348, 350 (Tex.Civ.App.—Austin, 1937, writ dism'd). Therefore those investors without actual possession of the original promissory notes are deemed unsecured. *In re Staff Mortgage & Inv. Corp.,* 625 F.2d 281, 283 (9th Cir.1980). Further, mov-

ants' contention that the Debtor holds the notes in constructive possession as agent or bailee for the investors fails since a debtor may not qualify as an agent of the secured party for the purpose of perfection by possession. *In re Bruce Farley Corp.,* 612 F.2d 1197, 1200 (9th Cir.1980).

■ Those movants in actual possession of the original promissory notes have properly perfected their interest under Texas law. Lack of proper indorsement of the note to the investor is immaterial. *Barney v. Rigby Loan & Inv. Co.,* 344 F.Supp. 694, 696 (D.Idaho 1972). As to these investors, the Court must apply the standards set out in 11 U.S.C. § 362(d) to determine whether the automatic stay should lift.

■ First, we must deal with the motion of K.P. Boromand and Rahad Rasnia, which presents a different situation than the rest of the motions considered herein. The Court finds Mrs. Boromand credible, and finds sufficient evidence of the existence of a promissory note from the Debtor to movants in the amount of $90,000.00, and holds that their security interest is valid. The movants have agreed to indemnify the estate pursuant to Tex.Bus. & Com.Code § 3.804, and to allow the Trustee to sell the property and remit the proceeds to movants.

The Trustee testified that the overall collection rate on the Debtor's notes is currently less than 20 percent. Such a low rate is indicative of collateral that is likely depreciating in value. Most investors have not received any payments from the Debtor since before bankruptcy, and none have been offered adequate protection postpetition. Hence, the Court finds adequate protection is lacking. *In re Sierra,* 73 B.R. 322, 323 (Bankr.D.P.R.1987); *In re Mathis,* 64 B.R. 279, 285 (Bankr.N.D.Tex.1986). Because of the reduced value of the notes due to the low collection rate, it is also clear that the Debtor has no equity in the notes. The Trustee also testified that rehabilitation of the Debtor is impossible and perhaps even illegal, and that a liquidating Chapter 11 plan will likely be proposed. There has been no showing that these particular properties are necessary to further

the interests of the estate through liquidation. *See generally In re Koopmans*, 22 B.R. 395, 407 (Bankr.D.Utah 1982). The Court therefore holds that the stay should lift as to those investors in possession of their original notes.

The Trustee and Trustee's counsel, and movants' counsel, are to be commended for their careful, thorough, and courteous handling of this case. Nothing contained herein should be construed to prevent the Trustee from bringing any appropriate actions pursuant to 11 U.S.C. §§ 544, 547, 548 or 549.

In view of the above findings and conclusions, it is

ORDERED that relief from the automatic stay is granted as to those movants who are in actual possession of original promissory notes, namely Monroe and Vivienne Corn (Hernandez, Kamarillo and Dixon notes only), Max and Glenda Murray and Cleo Donald Tergensen. Upon presentation to the Trustee of proof of possession of the original promissory notes, the investors in the James Ables, et al. group will be deemed perfected. The Trustee shall then supply any necessary documentation and indorsements so that those movants may enforce their rights under such notes. It is further

ORDERED that as to Rahad Rasnia and K.P. Boromand, the agreement of the parties to the effect that movants will indemnify the estate pursuant to Tex.Bus. & Com. Code § 3.804, and that the Trustee is to sell the property and remit the proceeds to movants, is hereby authorized, and it is further

ORDERED that as to all other movants, their status is determined to be unsecured and the stay will not lift. However, each of these unsecured creditors retains his or her right to receive proceeds from the distribution of the Debtor's assets, following the gathering of those assets by the Trustee, and the approval of a plan by the Court for distribution of those assets to the secured and the unsecured creditors of the Debtor's estate.