### In re CORPORATE FINANCING, INC., Debtor.

### CORPORATE FINANCING, INC., Plaintiff,

v.

### FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, Reisman, Peirez, Reisman & Calica, L.L.P., Samuel Hyman, as Trustee of the C & F Numismatics Corp. Profit Sharing Plan, Stewart Title Insurance of New York, Inc., Long Island Title Company, Florence Hyman, Defendants.

Bankruptcy No. 196–10176–260.
Adversary No. 196–1386–260.

United States Bankruptcy Court, E.D. New York.

June 9, 1998.

Flower & Medalie, Bay Shore, NY by Jeffrey Herzberg, for Plaintiff/Debtor.

E. Christopher Murray, Hempstead, NY by E. Christopher Murray, for Samuel and Florence Hyman.

Reisman, Peirez, Reisman & Calica, L.L.P., Garden City, NY by Robert M. Calica, Pro Se.

### DECISION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

CONRAD B. DUBERSTEIN, Chief Judge.

The instant matter comes before this court as an adversary proceeding brought by plaintiff Corporate Financing, Inc. (alternatively referred to as "plaintiff" or "debtor") seeking a declaration that certain notes and related mortgages are property of its bankruptcy estate pursuant to 11 U.S.C. § 541(a) and that plaintiff is entitled to the proceeds from some of those mortgages which are now being held in escrow. Defendants Samuel Hyman, as Trustee of the C & F Numismatics Corp. Profit Sharing Plan, and Florence Hyman (collectively referred to as "the Hyman defendants") filed an answer with counterclaims in which they contend that Corporate Financing, Inc. held these mortgages and notes solely as their agent and nominee. The Hyman defendants contend that pursuant to 11 U.S.C. § 541(d) said mortgages and notes are not property of plaintiff's bankruptcy estate, but instead belong to them as purchasers of "mortgage participations." Pursuant to Federal Rule of Civil Procedure 56, applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, Corpo-

rate Financing, Inc. has moved for summary judgment on the claims in its complaint. In response, the Hyman defendants have cross-moved for summary judgment seeking to have this court declare them the equitable owners of the mortgages and to have the mortgages reformed to reflect their ownership interests. Upon consideration of the facts and circumstances of this Chapter 11 case and after review of the arguments presented in this adversary proceeding, for the reasons stated below I find that plaintiff's motion for summary judgment should be granted and the Hyman defendants' motion for summary judgment must be denied.

## FACTS

Corporate Financing, Inc., a New York corporation, formerly operated a mortgage banking and investment business. Until October, 1994 Mr. Frank Scappaticci was the principal and sole stockholder of the plaintiff and personally controlled most of the corporate operations.[1] *See* Aff. of Ann Fattoruso, dated October 25, 1996, Pl.'s Mot. Summ. J, Ex. G (hereinafter referred to as "October, 1996 Fattoruso Aff."). The plaintiff's operations essentially consisted of two parts. The first part involved the origination of mortgage loans for institutional investors in exchange for an origination fee. As part of this mortgage banking business, the plaintiff would originate mortgage loans using funds advanced by an institutional investor, and eventually would transfer the mortgage documents to the institutional investor in exchange for a fee. Thereafter, the plaintiff would have no further involvement in the particular transaction. The second part of the plaintiff's business consisted of the origination of mortgage loans using funds solicited from individual, third party investors such as the Hyman defendants. It is the characterization of these investments by individuals that is in dispute in the instant adversary proceeding.

Most of the transactions involving individual investors were conducted in a similar manner. The plaintiff would originate and pro-

pose a loan to various parties to be secured by a mortgage on real property (usually a second or third mortgage). In order to fund these mortgage loans, the plaintiff solicited monies from individual investors. Once the individual investor agreed to fund a particular mortgage loan, the plaintiff and the individual investor would enter into a written agreement called the "Joint Venture Agreement" (alternatively "JVA"). Each agreement provided that the individual investor and the plaintiff were entering into a joint venture for the purpose of funding a particular mortgage loan made or to be made by the plaintiff. The individual investor agreed to provide the plaintiff with monies to be used for the purpose of making the loan, to be secured by a mortgage on real property. Further, the JVA stated the amount contributed by the individual investor and named the specific mortgage loan to which the investor was contributing funds.

In that portion of the JVA entitled "Salaries and Drawing" each agreement also stated that "in compensation for originating this Joint Venture and management of same during the term of its existence" the plaintiff would receive the difference between the interest collected on the loan to the mortgagor and the agreed upon interest rate to be paid to the individual investor. According to the JVA, the plaintiff was to remit interest payments to the individual investor each month. The JVA also provided that the plaintiff would hold all instruments and that title to those instruments would be acquired in the name of Corporate Financing, Inc., which would be "deemed the agent for the parties entering into this agreement." The agreement further provided that the plaintiff would have all the rights of an owner, including the right to receive and disburse the interest and principal received and the right to extend or collect the loan. The plaintiff also agreed that "all monies received are to be held in trust until distributed in accordance with this participation agreement." Finally, in a paragraph enti-

---

**1.** Mr. Scappaticci also controlled FAMS Management, Inc., an entity related to Corporate Financing, Inc. FAMS Management, Inc. is also a debtor in this court and its case has been proce-

durally consolidated with that of Corporate Financing, Inc. *See In re FAMS Management, Inc.,* Chapter 11 No. 196–10177–260.

tled "Operation and Term" the JVA stated that the joint venture was restricted to only that transaction and terminated when that transaction was completed. Upon termination, the plaintiff agreed to return all capital collected to each individual in proportion to his or her contribution. The plaintiff executed numerous JVA's with hundreds of individual investors as each mortgage loan the plaintiff issued was funded by several different investors in varying amounts.

While the JVA's executed by the plaintiff and the investors all contained similar language, how the plaintiff instituted each transaction with the individual investor was unique. With some investments, the investor provided the funds prior to the plaintiff's issuance of a loan to the mortgagor and thus prior to the execution of the JVA. With other investments, the individual investor agreed to fund a loan after the plaintiff had already issued that particular loan to the mortgagor and taken a mortgage on real property. The investments also varied as to the interest rate each investor received. Within each loan issued by the plaintiff, the numerous individual investors who had provided the funding for that loan received different interest rates on their investment—varying from several percentage points less than the interest rate paid by the mortgagor to sometimes that same rate, depending on what rate was stated in the JVA executed between the plaintiff and that investor.[2]

Following the plaintiff's execution of the loan to the mortgagor, a "transmittal letter" would be sent to the investor along with a copy of the JVA. The transmittal letter notified the investor that their funds had been placed in a specific mortgage loan and confirmed the interest rate to be paid, the amount of the loan, the amount of their investment and the appraised value of the real property securing the loan. In addition, the transmittal letter stated that "all papers

have been made in the name of Corporate Financing, Inc., your security with regard to this transaction is assured by the Joint Venture Agreement/Mortgage."

Individual investor funds which were received by the plaintiff were usually placed in either the plaintiff's checking or savings account, were paid an interest rate set by Mr. Scappaticci and were marked "uncommitted" until a specific mortgage investment was designated. Once the investor desired to fund a specific mortgage, the funds were designated "committed" and began to earn the interest rate stated in the JVA. It appears that Mr. Scappaticci exercised almost exclusive control over the treatment of investor funds and their allocation to specific mortgages. *See* October, 1996 Fattoruso Aff. ¶¶ 7–9. In addition, most investors did not independently select their investment in a particular mortgage but instead relied upon Mr. Scappaticci and the plaintiff to evaluate and research the viability of the proposed mortgage loans. *Id.*

In June, 1994 defendant Samuel Hyman, as Trustee of the C & F Numismatics Corp. Profit Sharing plan, entered into one such transaction with the plaintiff whereby he provided $100,000 which was used by the plaintiff to fund a loan in the amount of $100,000 to Ms. Elaine Landsman. The plaintiff took a mortgage on Ms. Landsman's home for the amount of the loan and held the mortgage note in its name. Pursuant to the terms of the JVA, C & F Numismatics Corp. Profit Sharing Plan ("C & F Numismatics") was to receive monthly payments amounting to a return of 8% on the money it invested, while the actual interest rate on the note Ms. Landsman signed was 13%. The plaintiff kept the difference (5%) as its compensation for originating and servicing the mortgage.[3] Similarly, commencing in 1989, defendant Florence Hyman entered approximately twenty such transactions, in which she ad-

---

**2.** One example of this is the loan for $275,000 made by the plaintiff to Ms. Theresa Merena. In that transaction the interest rate paid by Ms. Merena as the mortgagor was 16%. However, the various individuals who contributed funds to the plaintiff for the purpose of making that loan to Ms. Merena received returns on their investments varying from 8%–16%. *See* Pl.'s Mot. Summ. J., Ex. F.

**3.** Subsequently, in January, 1995 Ms. Landsman sold the real property which was securing the note in question, and $103,575 was deposited into escrow by agreement of the parties pending the outcome of this action.

vanced monies to the plaintiff for purposes of funding various mortgage loans made by the plaintiff. For each investment, Florence Hyman received a JVA and the accompanying transmittal letter, both indicating the particular mortgage loan for which her funds were utilized. However, unlike the C & F Numismatics transaction, Florence Hyman's investments were only for a portion of the total amount of the loan made by the plaintiff.[4] As previously described, Ms. Florence Hyman sometimes provided the plaintiff with funds before a specific loan and mortgage were executed by the plaintiff and the mortgagor, and sometimes Ms. Florence Hyman provided the funds for a specific mortgage only after the plaintiff had already loaned the money to the mortgagor and the mortgage had been executed.

The plaintiff's business continued as described, including the remittance of monthly interest payments by the plaintiff to defendants, until October, 1994. At that time the plaintiff's principal and sole stockholder, Mr. Frank Scappaticci, committed suicide. Following Mr. Scappaticci's death it was discovered that the plaintiff had continued to make payments to various investors, in accordance with the interest rate promised in the JVA, even though the underlying mortgagor had defaulted on its payments to the plaintiff. Indeed many of the loans in the plaintiff's portfolio were seriously in default. But rather than incur the wrath of investors, Mr. Scappaticci caused the plaintiff to continue making payments on defaulted loans.[5] To make matters worse, the defaulted loans were paid or "propped up" with funds the plaintiff had ostensibly solicited from investors for the purpose of making new loans. Upon this discovery, the plaintiff's accountant and attorneys called a meeting of investors at which those present were informed of the state of the plaintiff's operations and were told that all payments, even on performing loans, would cease.

Following the meeting of investors, the Hyman defendants instituted numerous lawsuits in the state courts where the real property securing the mortgages in which they invested was located. In these state court actions the Hyman defendants sought a declaration that they were the beneficial owners of the mortgages to the extent that they had provided the funding for said mortgages. In addition, the Hyman defendants sought reformation of the mortgages at issue to reflect their ownership status and to reflect that plaintiff was merely their agent and nominee. The plaintiff answered the complaints in the state court actions, and in certain of the actions the Hyman defendants sought summary judgment on their complaints. However, these state court actions were stayed when Corporate Financing, Inc. filed for relief under Chapter 11 of the Bankruptcy Code. Following the filing of its bankruptcy petition, the plaintiff commenced the instant adversary proceeding in order to have this court declare that the mortgage loans to which the investors contributed funds were part of the bankruptcy estate. The plaintiff contends that it filed for bankruptcy protection specifically for the purpose of conducting an orderly liquidation of its assets and providing an equitable distribution to all investors. To allow the Hyman defendants to recover on the mortgages in which they invested would, the plaintiff argues, diminish any return available to other investors who were also "victims" of the plaintiff's unorthodox business practices.

As part of its instant motion for summary judgment, the plaintiff contends that pursuant to Bankruptcy Code[6] § 541(a)(1)[7] the

---

4. For example, Florence Hyman provided the plaintiff with $19,000 to the plaintiff to be used to fund the $275,000 mortgage loan made to Ms. Theresa Merena. *See supra* note 2 and accompanying text.

5. The court makes no explicit finding that Mr. Scappaticci was the only individual involved in this course of conduct as part of the plaintiff's operations, as that is an inquiry for the appropriate authorities. However, no party has disputed that such payments by the plaintiff did occur, and that the plaintiff's corporate affairs were not properly conducted under Mr. Scappaticci's leadership. *See* Defs.' Cross–Mot. Summ. J. at ¶ 12.

6. Unless otherwise indicated, subsequent statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

7. Bankruptcy Code section 541(a)(1) states:
(a) The commencement of a case under section 301, 302, or 303 of this title creates an

mortgage loans and notes are property of the estate because Corporate Financing, Inc., in accordance with the terms of the JVA's, holds title to the documents and properly recorded its interests pursuant to state recording statutes. The plaintiff argues that the investors have the status of unsecured creditors of Corporate Financing, Inc. because any interests they may have had in the mortgage loans to which they contributed were not properly recorded or perfected. Further, the plaintiff argues that the Hyman defendants were not purchasers of "participations" in the various mortgages, thus Code § 541(d)[8] does not protect their interests. The plaintiff also argues that Bankruptcy Code § 541(d) is inapplicable to the instant proceedings because it did not participate in the national secondary mortgage market and because its fraudulent business practices preclude application of the statute.

In response, the Hyman defendants[9] have cross-moved for summary judgment seeking a declaration that pursuant to § 541(d) the mortgage loans are not property of the plaintiff's bankruptcy estate. The Hyman defendants contend that the Joint Venture Agreements represent the valid sale and purchase of mortgage participations, which are specifically exempted from the bankruptcy estate by § 541(d). They argue that they were not investors in the plaintiff, but instead they invested in specific mortgage transactions and that as a result they hold a beneficial interest in those mortgage notes and proceeds. Further, the Hyman defendants argue that since they chose to invest only in specific mortgage transactions, their recovery should not be dependant upon the performance or non-performance of the plaintiff's other loans.

## DISCUSSION

Federal Rule of Civil Procedure 56, applicable to this adversary proceeding through Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is appropriate where "there is no genuine issue as to any material fact" and where the movant would be "entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The party moving for summary judgment has the burden of establishing the absence of any material facts. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). In considering a motion for summary judgment, the court's role is not to resolve any issues of material fact which are in dispute, but rather to determine if there are any factual issues necessitating a trial. *See Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993). Upon evaluation of the briefs and affidavits submitted in connection with the instant cross-motions for summary judgment, the court is satisfied that there are no disputed issues of material fact which would require a trial. Instead, the parties' contentions are legal in nature and thus summary judgment is appropriate.

The plaintiff has moved for summary judgment as to that portion of its complaint which seeks a declaration that certain mortgages and notes for which the Hyman defendants provided funds are part of its bankruptcy estate within the meaning of

---

**8.** Bankruptcy Code § 541(d) states:

(d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

**9.** The defendants in this adversary proceeding other than Samuel and Florence Hyman were named solely as stakeholders, as they now are holding in escrow monies from mortgages involved in the instant dispute which have been satisfied. These stakeholder defendants have not participated in the cross-motions for summary judgment, but instead apparently await the outcome of the instant motions in order to determine their own rights and obligations.

estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

11 U.S.C. § 541(a)(1).

Bankruptcy Code § 541(a). The Hyman defendants have based their cross-motion for summary judgment upon the contention that they are purchasers of "participation" interests in the mortgages in question, and that Code § 541(d) specifically exempts interests such as theirs from the plaintiff's bankruptcy estate. Therefore, the threshold inquiry is whether the Hyman defendants purchased true mortgage participations and if so, whether such interests are to be excluded from the plaintiff's bankruptcy estate.

■ Although the description in § 541(a) of property to be included within the bankruptcy estate is broad, it is not all-inclusive. Instead, subsection (d) of the statute specifically excepts certain types of property as not being included in the estate. Section 541(d) provides that any property to which the debtor may hold legal title but in which the debtor has no equitable interest will only become part of the bankruptcy estate to the extent of the debtor's title, but the estate will not include any equitable interest in the property. *See Ryan v. Zinker (In re Sprint Mortgage Bankers Corp.)*, 164 B.R. 224, 228 (Bankr.E.D.N.Y.1994), *aff'd*, 177 B.R. 4 (E.D.N.Y.1995). According to the legislative history, § 541(d) was enacted specifically to protect transactions such as those within the secondary mortgage market, where the debtor/seller would retain title for the purposes of servicing the mortgages or mortgage interest which it had sold. *See* 124 CONG. REC. S17,-413 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini). Often in such transactions the seller does not endorse the notes to indicate the sale to the purchaser and the purchaser does not record his or her ownership interest pursuant to the applicable state recording statutes. *Id.* However, Code § 541(d) was enacted to ensure that such mortgage interests would be turned over to the purchaser and that secondary mortgage market sales would not be treated as loans from the purchaser to the seller. *Id.*

Since § 541(d) protects the sale of mortgage interests in the secondary mortgage market from challenges by bankruptcy trustees or debtors, the next inquiry is to determine whether the instant investments by the Hyman defendants were mortgage participations or whether they were outright loans to the plaintiff. A mortgage or loan participation is typically described as occurring when,

> an institution, acting as co-lender or which has otherwise acquired contractual privity with the borrower (hereinafter referred to as the "lead lender" or "lead"), lends money to a borrower pursuant to a loan agreement. After the loan agreement is executed and the documentation is otherwise complete, the lead lender then sells all or part of the loan to one or more purchasers. These purchasers are typically called participants.... [O]nly the lead lender or its assignee maintains direct contractual privity with the borrower. The participant's contractual relationship is solely with the lead lender.

W. Crews Lott et al., *Structuring Multiple Lender Transactions*, 112 BANKING L.J. 734, 735–36 (1995). While this describes most participations, courts have developed additional criteria helpful in determining whether a transaction is a true participation or a "disguised loan."

■ Generally, the presence of the following factors is an indication that a transaction is a participation:

1) money is advanced by the participant to a lead lender;

2) a participant's right to repayment only arises when a lead lender is paid;

3) only the lead lender can seek legal recourse against the borrower; and

4) the document is evidence of the parties' true intentions.

*See In re Coronet Capital Co.*, 142 B.R. 78, 82 (Bankr.S.D.N.Y.1992); *see also In re Sprint Mortgage Bankers Corp.*, 164 B.R. at 228. In contrast to these factors, indications that a transaction is a loan include the following:

1) guarantee of repayment by the lead lender to a participant;

2) participation that lasts for a shorter or longer term than the underlying obligation;

3) different payment arrangements between the borrower and lead lender and lead lender and participant; and,

4) discrepancy between the interest rate due on the underlying note and interest rate specified in the participation.

*See In re Sprint Mortgage Bankers Corp.,* 164 B.R. at 228.

■ The most determinative factor of all of these is the risk allocation involved in the transaction. If the participant does not bear the same risk of loss as the seller, or if the seller has made a guarantee of payment to the participant, the transaction is generally considered to be a loan and not a sale of a mortgage interest. *See In re Sprint Mortgage Bankers Corp.,* 164 B.R. at 228–29; *see also European Am. Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.),* 158 B.R. 926, 933 (Bankr.S.D.N.Y.1993) (citing *Ratto v. Sims (In re Lendvest Mortgage, Inc.),* 119 B.R. 199 (9th Cir. BAP 1990)). In a typical participation transaction, the participant shares the same risk as the lead lender regarding the receipt of payment, as both rely on the creditworthiness of the underlying borrower. *See In re Sprint Mortgage Bankers Corp.,* 164 B.R. at 229. In contrast, a loan transaction often includes a guarantee of repayment to the investor. *See In re Coronet Capital Co.,* 142 B.R. at 81.

Applying the factors described above to the Hyman defendants' investments leads the court to conclude that, while the transactions may appear to be loans, they nevertheless more closely resemble a mortgage participation instead. First, there was no contractual guarantee of repayment to the Hyman defendants, as the explicit terms of the Joint Venture Agreement do not provide for any guarantee of repayment. Instead, it was intended that the investors would receive payments as monies were received by the plaintiff from the mortgagors. *See Aff.* of Florence Hyman, dated January 4, 1997, Defs.' Cross–Mot. Summ. J., Ex. A. However, the plaintiff argues that guarantees of repayment were provided to the Hyman defendants. First, the plaintiff points to a promissory note which was allegedly issued by the plaintiff's principal, Mr. Frank Scappaticci, to defendant Samuel Hyman in connection with Mr. Hyman's investment of $100,000 in the "Landsman" mortgage. While the demand promissory note refers to the address of the Landsman property, and provides for the same rate of interest due to defendant Samuel Hyman under the Joint Venture Agreement, the note is not signed by Mr. Scappaticci. According to New York's Uniform Commercial Code § 3–401(1), "No person is liable on an instrument unless his signature appears thereon." N.Y.U.C.C. Law § 3–401(1) (McKinney 1991). Thus an unenforceable guarantee is no guarantee at all. As the promissory note allegedly provided to defendant Samuel Hyman to guarantee repayment of his investment in the Landsman mortgage is unenforceable, the plaintiff and Samuel Hyman shared the same risk of loss in the Landsman transaction. This persuasively supports a finding that the transaction constituted the sale of a mortgage participation.

The plaintiff also points to a promissory note issued by Mr. Scappaticci to defendant Florence Hyman in support of its contention that the investments made by the Hyman defendants were loans. However, the promissory note in question (in the amount of $50,000) was issued in connection with investments made by the defendants in FAMS Management, Inc., another Scappaticci-controlled entity. Because this promissory note does not directly relate to the transactions which are the subject of this adversary proceeding, the note does not constitute a guarantee of repayment for those investments by the Hyman defendants. The court will not assume that because guarantees were issued in certain of the Hyman defendants' transactions with Mr. Scappaticci, such guarantees were issued in all of the transactions.

The plaintiff has also argued that there was in essence a "functional" guarantee of repayment because it continued to pay investors their interest despite the fact that (unbeknownst to the individual investor) the underlying mortgagor had defaulted in its payments to the plaintiff. However, these payments by the plaintiff do not constitute an enforceable guarantee, but instead were part of the apparently fraudulent scheme designed to ensure that investors would continue to funnel money into the plaintiff's operations. *See Bear v. Coben (In re Golden Plan of Cal., Inc.),* 829 F.2d 705, 709–10 (9th

Cir.1986) (noting that despite debtor's advance of payments for underlying obligations which may have been in default, lack of a contractual guarantee of repayment indicates participation). As previously stated, the explicit language of the JVA's makes no reference to a guaranteed repayment of the defendants' investments. This directly contrasts to those instances where courts have found that transactions constituted loans because the investment was guaranteed. *See, e.g., Fireman's Fund Ins. Cos. v. Grover (In re The Woodson Co.)*, 813 F.2d 266 (9th Cir.1987) (finding that transaction was loan based upon debtor's guarantee of monthly interest payments regardless of underlying borrower's performance); *In re Sprint Mortgage Bankers Corp.*, 164 B.R. at 224 (holding that investors had made loans to debtor because debtor's principal had executed personal guarantees for the investments); *In re Coronet Capital Co.*, 142 B.R. at 78 (relying upon guarantee of repayment to investor, court held investment was loan). Because there is no ambiguity in the language of the JVA's regarding a guarantee, and no persuasive evidence regarding the parties' intent of a guarantee has been presented, there is no need to go beyond the JVA document to construe its meaning. *See In re Sackman Mortgage Corp.*, 158 B.R. at 932 (citations omitted).

■ The second most important factor in determining whether a transaction is a loan or a sale of a mortgage participation is the difference between the interest rate due on the underlying note and the rate specified in the agreement with the investor. *See In re Sprint Mortgage Bankers Corp.*, 164 B.R. at 229. Normally, the rate of interest received in a mortgage participation transaction is based upon the difference between the rate paid by the mortgagor/borrower and an amount which is reasonable to compensate the seller for servicing the loans on behalf of the investors. *See In re The Woodson Co.*, 813 F.2d at 272. However, when the investor receives a return or rate which is higher than the rate the originator of the loan receives, the transaction is likely to be construed as a loan instead of a participation. *See In re Sprint Mortgage Bankers Corp.*, 164 B.R. at 229. In the instant case, the

rates the Hyman defendants received on their investments were less than the rate paid by the mortgagor/borrower. The Joint Venture Agreements provided that the plaintiff would retain the difference between the (higher) rate paid by the mortgagor and the (lower) rate paid to the investor as compensation for servicing the loan. This is another strong indication that the investments by the Hyman defendants were participations and not intended as loans directly to the plaintiff. Indeed, it should be noted that in most of its transactions, the plaintiff paid the individual investors a range of interest rates below that of the underlying mortgagor. For example, in one transaction where the underlying mortgage rate was 16%, the plaintiff paid investors various interest rates between 7%–11%, with two investors receiving 16%. *See* Pl.'s Mot. Summ. J., Ex. F. This range of rates below the rate paid by the mortgagor is consistent with a characterization of the transactions as the sale of participations instead of loans. *Cf. Castle Rock Indus. Bank v. S.O.A.W. Enters., Inc. (In re S.O.A.W. Enters., Inc.)*, 32 B.R. 279, 282 (Bankr. W.D.Tex.1983) (finding that higher rate of repayment to investor than that paid to holder of underlying loan is consistent with loan transaction and not sale of participation).

■ A further indication that the investments more closely resemble mortgage participations is their stated term or duration. *See In re Sprint Mortgage Bankers Corp.*, 164 B.R. at 229. When the transaction with the investor has a stated term longer or shorter than the term of the underlying mortgage, this is an indication of a loan and not of a participation. *See In re Coronet Capital Co.*, 142 B.R. at 80. In the present case, the Joint Venture Agreements provide, in that portion entitled "Operation and Term," that the transaction between the plaintiff and the investor will "terminate when all aspects of this one transaction have been completed." Further, the agreement provides that upon termination, "all capital collected shall be returned to each of the Joint Venturers in proportion to their capital contribution." Thus, because the JVA's specifically state that the investments will not terminate until the underlying loan transac-

tion has terminated, the investments have the same duration as the underlying mortgage loans which is consistent with their characterization as mortgage participations.

 Upon application of the factors previously described to the investments at issue in this case, it is clear that these transactions are more consistent with being mortgage participations instead of loans to the plaintiff. In normal circumstances, such a finding would dictate that § 541(d) would apply and the participations would be excluded from the plaintiff's bankruptcy estate. However, the instant case is most certainly an abnormal situation. As will be detailed below, because of the pervasive fraud and improper business practices perpetrated by the plaintiff, I conclude that to mechanically apply § 541(d) to the instant situation would be contrary to the purpose of that section as well as contrary to the spirit of the entire Bankruptcy Code.

 As the statute's legislative history indicates, § 541(d) was enacted to protect "bona fide secondary mortgage market transactions." *See* S.REP. NO. 95–989, at 83 (1978); *see also* BLACK'S LAW DICTIONARY 161 (5th ed.1979) (defining "bona fide" as "in or with good faith; honestly, openly and sincerely; without deceit or fraud."). However, courts have been hesitant to apply § 541(d) in those instances where the sale of mortgage participations was not "bona fide" and where such sales have involved fraudulent business practices. Section 541(d) creates a presumption that in a legitimate secondary mortgage market transaction the retention of loan documents by the seller is retention of legal title only. *See Ables v. Major Funding Corp. (In re Major Funding Corp.)*, 82 B.R. 443, 448–49 (Bankr.S.D.Tex.1987). But, when the sale of participations is found to include poor business practice or outright fraud, that presumption is rebutted and the court will not allow the debtor's operations to be sanctioned by the statute. *Id.; see also Stockschlaeder & McDonald, Esqs. v. Kittay (In re Stockbridge Funding Corp.)*, 145 B.R. 797, 807 n. 21 (Bankr.S.D.N.Y.1992), *aff'd in part, rev'd in part*, 158 B.R. 914 (S.D.N.Y. 1993); *Colin v. Fidelity Standard Mortgage Corp. (In re Fidelity Standard Mortgage Corp.)*, 36 B.R. 496, 500 (Bankr.S.D.Fla. 1983), *aff'd*, 839 F.2d 1517 (11th Cir.1988). Poor business practice or fraud sufficient to preclude the application of § 541(d) can include commingling of investor funds into one general operating account, instead of maintaining separate accounts. *See In re Sprint Mortgage Bankers Corp.*, 164 B.R. at 229; *In re Stockbridge Funding Corp.*, 145 B.R. at 801 & n. 6. It can also include the use of "new" investor monies to pay senior investors, instead of paying investors the monies earned from the underlying transaction in which they invested. *See In re Stockbridge Funding Corp.*, 145 B.R. at 801. In the instant case, both parties agree that the plaintiff (allegedly because of the actions of Mr. Frank Scappaticci) engaged in all of these behaviors as, unbeknownst to the individual investors, its business collapsed into a classic "Ponzi scheme" as illustrated by the following facts.

The plaintiff engaged in several fraudulent and improper business practices in the sale of its "mortgage participations." The most disturbing of these practices included, according to one employee of the plaintiff, the practice of paying investors the interest due on their investment despite the fact that the underlying mortgagor had defaulted on the loan. *See* October, 1996 Fattoruso Aff. ¶ 11. In addition, the plaintiff's business records regarding its capitalization level were purportedly manipulated by Mr. Scappaticci to create the appearance that the plaintiff had more assets backing its operations than it actually did. *See* Pl.'s Mem. Supp. Mot. Summ. J. at 18–19. All of this was part of an apparent scheme to ensure that the New York State regulatory authorities did not revoke the plaintiff's mortgage broker licenses, as well as to ensure that new investor funds continued to pour in to the plaintiff's operation. *Id.* The Hyman defendants do not dispute the fact that the plaintiff engaged in such fraudulent practices, but instead contend that they were not aware of them and only learned, after Mr. Scappaticci's death, that they along with other investors had received payments on defaulted mortgages. *See* Defs.' Cross–Mot. Summ. J. at ¶ 12–13. Because plaintiff's unscrupulous business

practices are undisputed, I find that it would be inequitable to apply § 541(d) in the present case and to allow the Hyman defendants to recover on their specific mortgages, to the detriment of other investors.[10]

█ As a court of equity, the bankruptcy court is permitted to look beyond the form to the substance of a transaction in order to determine the "true nature of a transaction as it relates to the rights of parties against a debtor's estate." See In re Sackman Mortgage Corp., 158 B.R. at 932 (citations omitted). In applying this principle to the instant case, I conclude that it would be unfair to allow the Hyman defendants as well as the other investors to attempt any recovery as owners of "mortgage participations." One of the strongest policies within the Bankruptcy Code is that similarly situated investors receive equal distributions from the debtor's estate. See Hatoff v. Lemons and Assocs., Inc. (In re Lemons & Assocs., Inc.), 67 B.R. 198, 212 (Bankr.D.Nev.1986). Here the plaintiff perpetrated its fraud on most if not all investors, as some were improperly paid returns on defaulted mortgages while other investors were apparently induced to invest with the plaintiff and then their monies were improperly used for others' returns. Thus, there is the potential for competing equitable claims to the same underlying mortgages.[11] Id. at 213. Further, the plaintiff did not properly segregate investor funds but instead commingled all funds into either its checking or savings account. This failure to segregate "trust" funds can be fatal to an alleged participant's

equitable claim to the underlying mortgages. See In re Sprint Mortgage Bankers Corp., 164 B.R. at 229 (noting that to grant plaintiff's claims to specific mortgages, where funds were not segregated by the debtor, would create an inequitable result as to similarly situated investors). Not only would the application of § 541(d) to the instant case create an inequitable result among similar investors, but it would also be contrary to the very purpose of § 541(d), which as previously discussed, was implemented by Congress to protect bona fide sales of mortgage participations and not to sanction fraudulent business practices. Despite the fact that the Hyman defendants' transactions with the plaintiff more closely resemble the purchase of mortgage participations rather than loans to the plaintiff, it would simply not be fair in the instant case to apply § 541(d). As there are no unresolved issues of material fact and because it is undisputed that the plaintiff engaged in the previously described fraudulent business practices, a trial is not necessary in the instant case. Therefore, for the reasons stated above I find that the notes and mortgages in dispute are properly part of the plaintiff's bankruptcy estate pursuant to § 541(a), and as a result the plaintiff's motion for summary judgment is granted and the Hyman defendants' cross-motion for summary judgment is denied. All of the investors should be treated equally in the plaintiff's chapter 11 case, and should receive their pro rata share of the plaintiff's bankruptcy estate.

10. Plaintiff contends that § 541(d) is inapplicable to its operations because it argues that it did not operate in the national secondary mortgage market, and instead operated only within the New York metropolitan area. Because I find the statute inapplicable for other reasons, I will not address plaintiff's argument in that regard. I do however note that the statute gives no indication that it was meant to apply only to the national market. See Hatoff v. Lemons and Assocs., Inc. (In re Lemons & Assocs., Inc.), 67 B.R. 198, 208–09 (Bankr.D.Nev.1986) (stating that § 541(d) is not limited to the institutional or national secondary mortgage market).

11. While I have determined that the Hyman defendants' transactions most closely resemble mortgage participations, it is disturbing to note that the plaintiff's records reveal that many of the other investors' transactions may more close-

ly resemble loans. For example, some investors in certain transactions received the same interest rate as that paid by the underlying mortgagor. See Pl.'s Mot. Summ. J., Ex. F; see also supra note 2 and accompanying text. This eliminates one of the strongest indications that these investors purchased mortgage participations, as any such transactions would more closely resemble loans instead. See In re Sprint Mortgage Bankers Corp., 164 B.R. at 229. From these records it is clear that the plaintiff itself did not distinguish between the various "types" of investors, nor did the investors themselves consider such transactions any different from the others. This is one of the strongest arguments for treating all of the investors in a similar manner, as apparently all investors were in some manner victims of the plaintiff's fraud.

CONCLUSION

1. This court has jurisdiction over the instant matter pursuant to 28 U.S.C. §§ 157 & 1334 and the Standing Order of Referral of Cases to Bankruptcy Judges for the Eastern District of New York, dated August 28, 1986. The plaintiff's motion for summary judgment and the Hyman defendants' cross-motion for summary judgment are core matters within 28 U.S.C. § 157(b)(2)(A) & (O).

2. Plaintiff Corporate Financing, Inc.'s motion for summary judgment is granted. Defendants Samuel and Florence Hyman's cross-motion for summary judgment is denied.

3. Corporate Financing, Inc. is directed to settle an order in conformance with this decision.