In re FIDELITY STANDARD MORT-GAGE CORP., f/k/a S.B.I. Investors Corp., and First Fidelity Financial Services, Inc., Debtors.

Helen COLIN, Plaintiff,

v.

FIDELITY STANDARD MORTGAGE CORP., et al., Defendants.

Benjamin BLIER, Plaintiff,

v.

FIDELITY STANDARD MORTGAGE CORP., et al., Defendants.

Robert PRYOR, Plaintiff,

v.

FIDELITY STANDARD MORTGAGE CORP., et al., Defendants.

Bankruptcy Nos. 82–00637–BKC–JAG, 82–00638–BKC–JAG.
Adv. Nos. 83–0004–BKC–JAG–A, 83–0007–BKC–JAG–A and 83–0009–BKC–JAG–A.

United States Bankruptcy Court, S.D. Florida.

Aug. 30, 1983.

Chad P. Pugatch, Cooper, Shahady, Frazier & Pugatch, Fort Lauderdale, Fla., for trustee.

A.W. Beck, trustee.

Ronald Neiwirth, Neiwirth & Neiwirth, Miami, Fla., for plaintiffs.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

JOSEPH A. GASSEN, Bankruptcy Judge.

These three cases were not consolidated, but were tried consecutively on the same day. Because they raise the same legal issues, even though the facts of each are slightly different, consolidated Findings and Conclusions will be entered. Each plaintiff seeks a determination by the court that an assignment of mortgage to him or her had been so far perfected that the mortgage was no longer property of the debtor and did not become property of the estate.

The bankruptcy proceedings commenced with voluntary chapter 7 liquidation petitions by Fidelity Standard Mortgage Corp. and First Fidelity Financial Services, Inc. Subsequently, upon request of the debtors, both cases were converted to chapter 11 reorganization, and thereafter were returned to chapter 7 liquidation when reorganization proved impossible.

Fidelity Standard Mortgage Corp. was in the business of mortgage brokering, and of making loans secured by real estate. First Fidelity Financial Services, Inc. was in the business of procuring investors, to whom it would sell percentage participations in mortgage loans being made by Fidelity Standard Mortgage Corp. Upon the request of the trustee alleging that the financial affairs of the two debtors were so completely intertwined that they, in fact, constituted a single entity, an order was entered consolidating the two cases.

The evidence as to the debtors' method of operation is very skimpy, partly because the officers who operated it prior to bankruptcy are not available to give testimony and/or have exercised their constitutional rights to avoid self-incrimination. At the time of filing, the debtors' records were in complete disarray, but even at the beginning it was apparent that the substance of the debtors' business practices was, to say the least, unorthodox. The court is aware of many aspects of the debtors' business operation from knowledge of the bankruptcy proceedings and other adversary cases. Counsel in these adversaries have stipulated that that knowledge may be taken into consideration in deciding these cases.

As to some investors, the debtors gave assignments of both the note and mortgage and also properly recorded the mortgage. Other times the mortgage assignments were executed but not recorded, or investors were told that a mortgage was being assigned to them, but the assignment was never executed, and, of course, there were investors who were never even told of an assignment of any specific mortgage. The variations of these situations included investors who were being "rolled over" into different mortgages because the first had been satisfied, or foreclosed, or occasionally because it was unsatisfactory to the investor, and who got caught with documentation at various stages bridging the roll-over at the time of bankruptcy. There were numerous fractional assignments of mortgages, and in some cases assignments of more than 100% of a mortgage. Also, mortgages were sometimes "assigned" before they were funded to the mortgagor. Other investors received "interest" before they received assignments, or before the mortgages which were assigned to them were funded.

Each of these three adversary cases followed a similar factual pattern, and the testimony of each plaintiff was essentially undisputed. Each of the plaintiffs had learned about the debtors' operation through advertising, word of mouth, or some other source. Each approached the debtors, became interested in their offerings, and determined to make an investment. In each instance, the plaintiffs paid a sum of money in order to purchase a participation in a particular mortgage. The mortgage interest being purchased was identified to each plaintiff by the debtor by the submission to plaintiff of an "investment package" which generally included an appraisal of the subject real property, a copy of the note and mortgage payable to Fidelity Standard Mortgage Corp., and various other financial and real estate information. Included in each "investment package" was a two page "mortgage servicing agreement" in letter form, which also identified the mortgage interest by the debtors' file number and name of the mortgagor,

the undivided percentage being purchased by the plaintiff-customer, and the dollar amount of that interest. The servicing agreement was signed by the debtors, and the customer-plaintiff was requested to countersign and return it. In each of these three cases, the plaintiff testified that he or she did execute and return the servicing agreement.

Plaintiff Helen Colin received the "investment package" which identified her mortgage interest, and signed and returned the servicing agreement, but no assignment of her proposed interest in the mortgage was ever prepared. Benjamin Blier received the investment package and returned the servicing agreement. An assignment of his interest in the mortgage was prepared but never executed. Robert O. Pryor, on the other hand, received the investment package and signed and returned the servicing agreement. In his case, the appropriate assignment of mortgage interest was prepared and executed, but was never recorded in the public records of the appropriate county.

In each case, the relevant mortgage was funded by the debtors, and the debtors did not sell more than 100% thereof to customers.

## LAW

11 U.S.C. § 541(a) defines property of the estate to include all legal or equitable interests of the debtor in property, as of the commencement of the case. However, § 541(d) confirms that any equitable interest held by another does not become property of the estate, and that if the debtor held only bare legal title, only the bare legal title becomes property of the estate. The plaintiffs contend that they held either a legal or equitable interest in the mortgages in question and that these mortgage interests do not become a part of the estate to that extent. Pryor apparently claims a legal interest since an assignment in his favor had been executed. The other plaintiffs could not claim more than an equitable interest—through the imposition of a con-

structive trust on the mortgages in question—because no assignments to them were even executed.

■ If there is no conflict between state and bankruptcy law, state law governs on questions of title to property and the nature of ownership in bankruptcy, *Fowler v. Pennsylvania Tire Co.,* 326 F.2d 526 (5th Cir.1964). But the power of Congress to establish uniform bankruptcy laws is unrestricted and paramount and bankruptcy law will preempt state law if they are in conflict, *International Shoe Co. v. Pinkus,* 278 U.S. 261, 49 S.Ct. 108, 73 L.Ed. 318 (1929).

■ Under Florida law, this court concludes that plaintiffs would have no ownership interest in any of the mortgages sufficient to remove them from property of the estate. Fla.Stats., § 701.02(1), provides:

> No assignment of a mortgage upon real property or of any interest therein, shall be good or effectual in law or equity, against creditors or subsequent purchasers, for a valuable consideration, and without notice, unless the same be recorded according to law.

Under 11 U.S.C. § 544(a) the trustee in bankruptcy has the rights and powers of a hypothetical judicial lien creditor, part of the "strong arm" powers of the trustee. As such, an unrecorded assignment of a mortgage would not be good against the trustee.

■ It might be argued that, nevertheless, a constructive trust in favor of each plaintiff should be imposed, and that this would remove the mortgage assignments from the bankruptcy estate. Even without considering the elements which are required as the basis for imposing a constructive trust, this court concludes that the Florida statute would also preclude giving any plaintiff in these cases that equitable remedy. The language of § 701.02(1) is about as clear as the legislature could make it that no unrecorded assignment of mortgage is to be enforced against creditors in law *or equity.* Since an unrecorded assignment of mortgage may not be enforced in equity against creditors, it would be improper under state law for the bankruptcy court to give the intended assignees (plaintiffs) the benefit of a constructive trust which would have the effect of enforcing the assignment against the trustee by excluding that beneficial interest from the estate.

■ The next determination that this court must make is whether or not this state law is in conflict with bankruptcy law. We conclude that it is. It appears that under § 541 Congress specifically intended to protect mortgage assignees, despite deficiencies in title under state law, in order to protect the secondary mortgage market.

■ In defining what is and is not property of the estate, in § 541(d), Congress did not make a bare reference to equitable versus legal interests, but gave examples:

> ... such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest ...

If this language were taken as merely illustrative it would not be in conflict with contrary state law. But the legislative history of § 541(d) reveals that the secondary mortgage market, of which the debtors' business was a part, was of particular concern to Congress. It is clear that Congress was convinced that the operations of the secondary mortgage market would be jeopardized by the enforcement in bankruptcy of statutes such as Fla.Stats., § 701.02. See discussion in *In re Adana Mortgage Bankers, Inc.,* 12 B.R. 989 (Bkrtcy.N.D.Ga. 1980), at 1005–1008, and Collier on Bankruptcy, 15th ed., ¶ 541.24. Senate Report No. 95–989, 95th Cong. 2d Session (1978) at 84, U.S.Code Cong. & Admin.News 1978, p. 5787 demonstrates that the Congressional intent may have been even broader than the express language of § 541(d):

> The committee notes that in secondary mortgage market transactions the parties may characterize their relationship as one of trust, agency, or independent contractor. The characterization adopted by the parties should not affect the statutes [sic]

in bankruptcy of bona fide secondary mortgage market purchases and sales.

And further, at 124 Cong.Rec. S17,413 (1978):

The seller of mortgages in the secondary mortgage market will often retain the original mortgage notes and related documents and the seller will not endorse the notes to reflect the sale to the purchaser's ownership of the mortgages or interests in mortgages under State recording statutes. These facts are irrelevant and the seller's retention of the mortgage documents and the purchaser's decision not to record do not change the trustee's obligations to turn the mortgages or interests in mortgages over to the purchaser. . . .

Thus, Congress did intend the exclusion from the bankruptcy estate of investors' interests in mortgages, whether or not those investors have an interest (in the mortgage itself) enforceable in equity under state law.

The court still must determine, however, exactly what rights § 541(d) gives the plaintiffs in this case, as it is interpreted with the legislative history in mind. This is a more complicated exercise than is usually the case in applying bankruptcy law to pre-empt state property law in the area of trusts. If under state law or other federal law a creditor is given an equitable interest, the courts in the past have sometimes found that this conflicts with the distribution priorities set by bankruptcy law, and have refused to give effect to the other law. See e.g., *Wisconsin v. Reese, In re Kennedy & Cohen,* 612 F.2d 963, 6 B.C.D. 128 (5th Cir. 1980), although some of the cases of this type have apparently been overruled by Congress in the enactment of the Bankruptcy Code. See discussion in *Selby v. Ford Motor Company,* 590 F.2d 642 at notes 6 and 16 (6th Cir.1979). In § 541(d), however, Congress is giving *greater* property rights to a certain class of creditors. than the state of Florida would, but it is not exactly clear how far those additional rights extend.

The language of both § 541(d) and the legislative history are keyed to the sale and purchase of mortgages, but the intent expressed in the legislative history is that the operations of the secondary mortgage market not be disrupted. The court must decide to what extent the apparent sloppiness of the debtors' operations was intentional in order to facilitate the operation of the secondary mortgage market business, which is to be protected by Congress, rather than being due to bad business operations or outright fraud.

The court concludes that where the debtors' business was mortgage brokering, and where, as here, the divergence in method of operation from the strict requirements of state law served to facilitate the transfer and servicing of mortgages, there is a presumption that transactions were handled in that manner for that purpose. Although there were slight suggestions of fraud and ignorance of the mortgage business or of good business practice generally, there was insufficient evidence that any of these was the reason for the debtors' failure to execute or record assignments of mortgages. Therefore the presumption stands and the debtors' operations generally will be deemed to be sanctioned by § 541(d).

This still leaves the question of when a particular sale should be deemed sufficiently complete to protect. For lack of any other guideline, the court will use this standard: If the investor and debtors agreed on what specific mortgage interest was to be assigned to the investor, with the debtors' assent being evidenced by any writing which links the investor and the specific mortgage interest; if the investor paid in full for the mortgage interest; and if that mortgage was in existence (having been funded and not repaid or foreclosed); then the plaintiffs' interests in the various mortgages should be protected under § 541(d). If, on the other hand, the particular facts represent a transaction in progress, with no sale complete, or if the documentation instead represents an attempt by the debtors to defraud investors or has some other basis than the necessities of the secondary mortgage market, it will not be protected by § 541(d). This is a

somewhat cumbersome standard to apply, and is also hard to reconcile with other provisions of the Bankruptcy Code, but any alternative would seem to ignore the Congressional purpose when it enacted this section.

Applying this standard, each of the plaintiffs in the three cases presently before the court will prevail over the trustee, and their interests in their respective mortgage assignments do not come into the debtors' estate. The trustee has previously rejected the servicing agreements. The trustee will be ordered to complete the assignment of these mortgages to the respective plaintiffs in accordance with state law.

Pursuant to B.R. 9021(a), a separate Final Judgment incorporating these facts is being entered this date.