**In re CEDAR FUNDING, INC., Debtor.**

**Larry W. Rollins and Marie P. Rollins, individually and as Trustees of the Rollins 2002 Family Trust, dated July 1, 2002, Douglas N. Forzani and Shirley J. Forzani, individually and as Trustees of the Forzani 1994 Revocable Family Trust, dated October 26, 2004, Plaintiffs,**

v.

**R. Todd Neilson, Trustee for Debtor, Cedar Funding, Inc., Defendant.**

**Bankruptcy No. 08–52709–MM.**
**Adversary No. 08–5155.**

United States Bankruptcy Court, N.D. California.

April 10, 2009.

Larry J. Lichtenegger, Vincent C. Catania, Law Office of Vincent C. Catania, Monterey, CA, for Plaintiffs.

Cecily A. Dumas, Gail S. Greenwood, Robert E. Clark, Stefanie A. Elkins, Friedman, Dumas and Springwater, San Francisco, CA, for Defendant.

## OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR SUMMARY ADJUDICATION

MARILYN MORGAN, Bankruptcy Judge.

### INTRODUCTION

Cedar Funding, Inc. (CFI) accepted many millions of dollars from hundreds of individuals who believed they were acquiring fractional interests in loans that were secured against real property. Many more invested with CFI through a related entity, Cedar Funding Mortgage Fund LLP (the Fund), that acquired fractional interests in the name of the Fund. Now,

the strong light of bankruptcy has revealed that CFI failed to record assignments of its deeds of trust that would have provided security interests to most of its investors, including the Fund. Since the deeds of trust and other assets in CFI's estate total only a fraction of the amount invested, the challenge is to determine how to distribute the remaining assets.

Plaintiffs, as individual fractional investors, seek a determination that they have an equitable lien securing repayment of their $445,000 investment with CFI. The trustee of CFI's estate has filed a counter-motion for summary judgment. The trustee not only disputes the plaintiffs' entitlement to an equitable lien, but also urges that widespread misconduct in the CFI's operation precludes recognition of any equitable liens. In other words, the trustee asserts that in a Ponzi scheme such as this, the interests of equity and fairness militate in favor of the principle of ratable distribution among investors.

### PROCEDURE ON SUMMARY JUDGMENT

Summary judgment obviates the need for trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed R. Bankr.P. Rule 7056(c), *incorporating,* Fed.R.Civ.P. Rule 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions and declarations that are part of the record. Fed.R.Civ.P. 56, Notes of Advisory Committee on Rules. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In response, the non-moving party must use the same evidentiary tools to designate specific material facts showing that there is a genuine

issue for trial. *Id.* at 324, 106 S.Ct. at 2553. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the nonmoving party's evidence is to be believed and all reasonable inferences from the facts must be viewed in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

Cross motions for summary judgment do not relieve the court of its obligation to determine whether summary disposition of the case is appropriate. Rather, each motion must be considered on its own merits. *Fair Housing Council of Riverside County, Inc. v. Riverside Two,* 249 F.3d 1132, 1136 (9th Cir.2001). The mere fact that both parties assert that no genuine issue of material fact exists does not eliminate the court's independent duty to determine whether factual disputes preclude summary judgment in favor of either party. *Id.*

### FACTS

### CFI and its Operations

David Nilsen, who was a licensed real estate broker, ran a mortgage investment business, using various related entities. The business commenced operation in 1980 and grew to a multi-million dollar venture over the next quarter century. Nilsen Decl., ¶ 2 [Main Case Docket No. 51–6]. Prior to 2003, Nilsen operated the business as a sole proprietorship, under the name "David A. Nilsen dba Cedar Funding." Judd Decl., ¶ 5 [AP Docket No. 42]. In 2003, Nilsen incorporated CFI and began to operate his brokerage business through the corporation, serving as CFI's president and sole shareholder. *Id.* ¶ 6. In February 2004, Nilsen formed the Fund, a "blind pool" mortgage fund, and made CFI the Fund's sole managing member. *Id.* ¶ 8. Nilsen also used another wholly owned company, Accustom Development, LLC, to facilitate transfers of real estate.

R. Todd Nielson, the trustee of CFI's bankruptcy estate, retained his accounting firm, LECG, LLC, to assist him in reviewing CFI's loan portfolio and analyzing its operations. *See* Application and Order Granting Application to Employ LECG [Main Case Docket Nos. 131 & 172]. David Judd, a director of LECG, is a CPA and has been performing forensic investigations for twenty-eight years, including several Ponzi scheme investigations. Judd Decl., ¶ 2 [AP Docket No. 42]. Judd personally reviewed CFI's bank statements, as well as its mortgage loan, investor and other electronic files that were turned over to the trustee. *Id.* ¶ 3. He also reviewed records that were subpoenaed from banks where CFI maintained accounts, as well as CFI's mortgage records and its records of Fund investor activity. *Id.* ¶¶ 4 & 8. Judd's review, along with other evidence in the record, reveals the following facts.

CFI, as a corporate entity, was not a licensed real estate broker. DRE Case No. H–2261 FR Desist & Refrain Order, p. 1–2 (May 16, 2008)[Main Case Docket No. 15–5]. Nevertheless, CFI originated and serviced loans that were funded by third party investors who took fractionalized interests in CFI's notes and deeds of trust. Judd Decl., ¶ 6 [AP Docket No. 42]. Before incorporation, Cedar Funding documented and recorded the fractionalized interests of its investors in a fairly consistent manner. *Id.* ¶ 7. CFI's practice began to change in 2003 and, by 2004, it no longer executed or recorded the documents necessary to transfer fractional interests to its investors. *Id.* A review of the preliminary title reports in CFI's loan portfolio establishes that CFI failed to record all but 79 of nearly 1200 fractionalized interests in deeds of trust until a week or two before CFI's May 2008 bankruptcy petition, and often later. *Id.* ¶ 15.

CFI maintained paper files on the various loans that it originated. Although record-keeping was inconsistent, typical loan files turned over to the trustee contain the borrower's loan application, a copy of a executed promissory note in favor CFI as sole payee and a copy of a recorded deed of trust in favor of CFI securing payment of the note. *Id.* ¶ 12. The files also contain copies of acknowledgment letters to any third party investors. These letters indicate that CFI generally transmitted to the investors copies of the original note and deed of trust, along with a Loan Servicing Agreement, a Lender/Purchaser Disclosure Statement, an unsigned Promissory Note Endorsement from CFI to the investor and an unsigned Assignment of Deed of Trust. *Id.*

Upon its formation in 2004, the Fund's objective was to make or invest in loans secured by deeds of trust. Its solicitation materials falsely touted CFI as a licensed California real estate broker and indicated that all Fund loans would be arranged through CFI's license. Fund Offering Circular at p. i attached to LePage Decl., Request for Judicial Notice Re Motion to Appoint Trustee, Ex. 3 [Main Case Docket No. 15–9]. Investors purchased units that represented membership interests in the Fund, and CFI was to hold invested funds in a subscription account on behalf of each investor until the funds were needed for investment in a mortgage loan. *Id.* at p. 4. Investments in mortgage loans were to be made through an escrow handled by CFI or an escrow company. No funds were to be released from escrow unless all loan documents and insurance policies named the Fund as payee and beneficiary. Fund investments specifically were not to be held in the name of CFI or its nominee. *Id.* at p. 8.

Despite the restrictions in the Fund's solicitation materials, the operations of CFI and the Fund were interwoven from the outset. Once the Fund was formed, CFI's mortgage records consistently indicated that the Fund was the original 100% owner of virtually every CFI-originated loan. Judd Decl., ¶ 10 [AP Docket No. 42]. CFI's sales agents would then solicit the purchase of interests in the loan. *Id.* ¶ 12. Any unsold portion remained booked as a fractional interest of the Fund. *Id.* ¶ 16. The book entries of the Fund's ownership interests, whether 100% or less, were never supported by note endorsements or assignments of deeds of trust from CFI to the Fund. *Id.* ¶ 10. Indeed, in April 2008, Nilsen conceded that the Fund was not named as a beneficiary on any of the loans made with Fund assets. Guenther Decl., ¶ 29 [Main Case Docket No. 14].

The intimate relationship between CFI and the Fund is also evident from banking records. Nilsen operated both entities through a number of bank accounts that allowed him to transfer funds between the companies at will. Nilsen paid the general operating and administrative expenses of both CFI and the Fund from a single account at First National Bank. Sinclair Decl., ¶ 4 [Main Case Docket No. 106]. However, the main gateway controlling the flow of funds for both companies was CFI's escrow account at Wells Fargo Bank. As of 2004, CFI deposited all interest payments received from borrowers, all loan pay-offs and all new investments, whether from individuals or the Fund, into the escrow account. From the escrow account, CFI funded loans to its borrowers. It also served as the source of funds for monthly interest payments to CFI's investors as well as for the payment of all investor redemptions. Judd Decl., ¶ 20 [AP Docket No. 42]. Generally, amounts received from individual fractional investors and deposited into CFI's escrow were accurately entered into CFI's mortgage records. Similarly, amounts withdrawn

from the escrow account to fund loans to borrowers were recorded in the mortgage records. As a result, from a record-keeping perspective, CFI's mortgage records tend to accurately portray the investment balances of individual investors and the outstanding loan balances owed by borrowers. McGilloway Decl., p. 4 [Main Case Docket No. 431–5].

Two Wells Fargo accounts, designated as CFI's and the Fund's servicing accounts, were used respectively to write checks for monthly interest payments to CFI's and the Fund's investors. July 2008 Errico Decl., ¶¶ 2 and 4 [Main Case Docket No. 105]. It was CFI's standard practice to make interest payments to its investors each month regardless of whether CFI received payment from the borrower on the underlying loan. Judd Decl., ¶ 14 [AP Docket No. 42]. As detailed below, the plaintiffs received approximately three years of monthly interest payments from CFI related to the Larocca property, but Larocca made only nine interest payments on his loan before he stopped paying altogether. As another example, in 2001 and 2002, Cedar Funding made two separate loans to one borrower both secured by the same property. Cedar Funding assigned the first loan to a single investor, and the second loan was placed with multiple investors. When the borrower stopped making interest payments, Nilsen took title to the property through his wholly owned company, Accustom Development, but CFI continued to pay interest to the investors in both notes for nearly five additional years. Id.

The commingling of investment money and borrower payments into CFI's escrow account, along with "as needed" transfers between accounts, facilitated CFI's ability to make monthly interest payments to its investors, regardless of whether a borrower was performing. Each month, CFI calculated the total amount it would need to pay out to either borrowers or investors for all purposes. Id. ¶ 19. If the escrow account contained sufficient cash, CFI would transfer the amount needed to meet those monthly obligations from the escrow account into CFI's servicing account where checks would be written to CFI's borrowers and its investors. Id. When the Fund was owed interest as a CFI investor, the amount of that interest payment was transferred directly from CFI's servicing account to the Fund's servicing account. Id. The Fund, in turn, wrote interest checks from the Fund's servicing account to its investors. Id. If, however, the escrow account did not contain sufficient funds to cover CFI's monthly obligations to its investors, Nilsen obtained the money from another source, often the Fund's subscription account, and moved it into the escrow account. Id. ¶ 22. After replenishing the escrow account, CFI would transfer funds to its servicing account so it could write checks for the monthly interest payments to its investors.

Checks for new investments into the *Fund* were deposited in the Fund subscription account and checks related to the Fund's investment in loans were drawn on that same account. July 2008 Errico Decl., ¶ 4 [Main Case Docket No. 105]. Nevertheless, the banking records indicate that there was no real correlation between transfers from the Fund's subscription account to CFI's escrow account and the Fund's investment in CFI loans. Judd Decl., ¶ 23 [AP Docket No. 42]. As noted above, if the escrow account was short, Nilsen moved funds from the subscription account to the escrow account even when no new investment was made. In those instances, the Fund's subscription account, rather than funding new investments, served as the source of funds to make interest payments to investors, including to itself. Additionally, even though the

Fund was entered in the mortgage records as the initial 100% owner of CFI loans, bank records do not show corresponding transfers in the amount of the loans from the Fund subscription account to CFI's escrow account. *Id.* ¶ 23. Similarly, the bank records do not show any transfers of money from CFI back to the Fund as CFI sold fractional interests in notes and mortgages that were previously listed as 100% owned by the Fund. *Id.* ¶ 24. There is no evidence in the record, and the trustee's forensic accountant states that none exists, to reconcile the exchange or assignment of fractional interests with the actual transfer of money between CFI and the Fund. *Id.* As noted above, Nilsen seemed to transfer money between accounts at will.

CFI's practice of assigning any unsold or residual interests in loans to the Fund, along with the absence of actual fund transfers, created substantial discrepancies regarding the Fund's actual investments. Errico Manoel, CFI's loan servicing manager, maintained a second set of investment records for the Fund that was provided to outside auditors examining the Fund's operations. *Id.* ¶ 11. Discrepancies between CFI's mortgage records and Errico's records for the Fund are substantial. As of the end of 2005, Errico's records reflected that the Fund had given CFI $22.5 million for investment in fractionalized mortgage interests. CFI's mortgage records, by contrast, showed that the Fund had only invested $11.5 million with CFI. *Id.* ¶ 16. This discrepancy is not explained by any records available to the trustee's forensic accountant. *Id.*

Because CFI did not transfer fractional interests in mortgage loans that it originated to its investors, CFI had the ability to and used its continued ownership of the notes and deeds of trust to its advantage over that of the investors. This often played out in the context of subordination agreements. For example, Judd uncovered several instances where CFI, without investors' knowledge or consent, agreed to subordinate the priority of what should have been investors' deeds of trust. *Id.* 25. In fact, as detailed below, the plaintiffs' interests in the Larocca property were subordinated to a subsequent loan in September 2006. Request for Judicial Notice of Subordination Agreement [AP Docket No. 43]. Additionally, on at least three occasions, CFI sold 100% of a note to fractionalized investors and then resold the same note to different investors, keeping the proceeds from all the transactions. Judd Decl., ¶ 25 [AP Docket No. 42].

After March 2008, CFI stopped making interest payments to its investors, including the Fund. On April 16, 2008, attorneys who represented several investors in the Fund, met with Nilsen to discuss their clients' concerns over management of the Fund. During that meeting, Nilsen told the attorneys that he had to reduce the rate of the interest payments because he was no longer receiving new investments. Guenther Decl., ¶ 11 [Main Case Docket No. 14]. He further advised that he had to stop payments altogether because he was not getting new investors. Duffy Decl., ¶ 7 [Main Case Docket No. 12]. At an April 23, 2008 meeting of CFI investors, Nilsen reconfirmed that he could not make further distributions to existing investors because he had no new investors. Guenther Decl., ¶ 40 [Main Case Docket No. 14].

Evidence in the record demonstrates that the business operations described above violated state laws and regulations governing mortgage brokerage businesses. In October 2005, a California Department of Real Estate preliminary audit of Nilsen's operations revealed that Nilsen had accepted investment funds from private

investors without respect to any specific loan, real property sales contract, or promissory note that would be secured against specified real property. The DRE's investigation indicated that Nilsen had pooled funds and originated loans even when there were not enough investors to fund a new loan. It also uncovered Nilsen's failure to record trust deeds in the name of the fractionalized lender/ investors. DRE Case No. H–9425 SF Accusation, Request for Judicial Notice Re Motion to Appoint Trustee, Ex. 4 [Main Case Docket No. 15–2, p. 35]. In June 2006, Nilsen stipulated that he did not contest the DRE's accusations despite his understanding that the accusation would constitute sufficient evidence for disciplinary action. DRE Case No. H–9425 SF Stipulation and Agreement, Request for Judicial Notice Re Motion to Appoint Trustee, Ex. 14 [Main Case Docket No. 15–7]. Among other things, the stipulation suspended Nilsen's license for 100 days and imposed a $10,000 fine. Nilsen further agreed to pay for a future audit to determine if the escrow account trust fund violations had been corrected. *Id.* In July 2006, the 100 day suspension of Nilsen's license was abated on the condition that no further cause for disciplinary action against Nilsen would occur within two years.

On April 30, 2008, the California Department of Corporations summarily suspended the Fund's permit to sell securities in the form of its membership interests. DOC Order Summarily Suspending Permit, Request for Judicial Notice Re Motion to Appoint Trustee, Ex. 10 [Main Case Docket No. 15–5]. The DOC's action was based on evidence of misrepresentations in the Fund's offering circular that the Fund's manager (CFI) was a licensed California real estate broker. DOC Accusation, Request for Judicial Notice Re Motion to Appoint Trustee, Ex. 11 [Main Case Docket No. 15–5]. The DOC also cited the Fund's June 2007 audited financial statement which indicated that the Fund had improperly exposed its members to unsecured loss by disbursing loan proceeds in excess of the amounts secured by recorded deeds of trust. *Id.* The DOC further relied on the findings of the Fund's auditors that over 22% of the Fund's investments were in trust deeds recorded in favor of CFI or ·its affiliates, like Accustom Development. *Id.* Based on these facts and others related in the DOC Accusation, the DOC found that the Fund "does not intend to transact business fairly and honestly." and that it was in the public interest to have a stop order issued. *Id.*

On May 16, 2008, the DRE issued an order directing Nilsen and CFI to desist and refrain from all loan servicing activities until CFI obtained a corporate real estate broker's license and until Nilsen obtained loan servicing agreements with respect to four specific loans. DRE Case No. H–2261 FR Order to Desist and Refrain, Request for Judicial Notice Re Motion To Appoint Trustee [Main Case Docket No. 15–5, p. 4]. That same day the DRE reinstated the 100 day suspension of Nilsen's license based on a new DRE audit that revealed multiple and continuing violations of California's Business and Professions Code. DRE Case No. H–9425 SF Order Suspending Real Estate License, Request for Judicial Notice Re Motion to Appoint Trustee, Ex. 7 [Main Case Docket No. 15–5, p. 1]. Specifically, the audit of a two year period beginning January 1, 2006 disclosed that CFI's escrow account was out of trust by $13,952,051.55. DRE Case No. H–2260 FR Accusation, Request for Judicial Notice Re Motion to Appoint Trustee, Ex. 9 [Main Case Docket No. 15–5, p. 10]. The audit also identified numerous other irregularities and violation of laws governing the handling of trust accounts. *Id.;* Moran Decl., at ¶ 9 [Main

Case Docket No. 46]. For example, Nilsen had failed to have CFI perform a monthly reconciliation of the separate beneficiary balances and transaction records with the funds received and disbursed from his various trust accounts. The audit also revealed that Nilsen had failed to record deeds of trust in the names of the individual lenders as beneficiaries and, in some instances, Nilsen had recorded deeds of trust in favor of CFI instead in the names of the lenders as beneficiaries. DRE Case No. H–2260 FR Accusation, Request for Judicial Notice Re Motion to Appoint Trustee, Ex. 9 [Main Case Docket No. 15–5, p. 11]. Further, the DRE audit indicated that Nilsen had made approximately $37 million in insider loans to himself and his wholly owned affiliate, Accustom Development, and did not report those borrowings to the DRE. *Id.* [Main Case Docket No. 15–5, p. 6]. Finally, the DRE audit uncovered a loan where CFI had a fractionalized investor but, without the investor's knowledge, acted in direct contravention of that interest by transferring the deed of trust to his own wholly-owned corporation and then into his own name and that of his wife. *Id.* [Main Case Docket No. 15–5, p. 14–15].

### Larocca Note and Deed of Trust

In early 2005, CFI provided a $300,000 mortgage loan to Vincent R. Larocca. The note, dated January 27, 2005, required interest only payments at 14% with a balloon payment of the entire principal and interest due on February 1, 2007. The loan was secured by a second deed of trust against Larocca's property located at 414 Alvarado in Monterey, California. Rollins/Forzani Decl., Ex. D [AP Docket Nos. 29 and 32].

CFI's funding and disbursement history for the Larocca loan indicates that the loan was initially funded on January 31, 2005. Rollins Supp. Decl., Ex. D [AP Docket No. 45]. CFI's Incremental Loan Distribution record for the loan shows that the Fund and Peter Rusch respectively invested $245,000 and $55,000 with CFI and the funds were assigned to the Larocca loan. *Id.,* p. 3 and Ex. C. No bank statement is of record to confirm investor deposits from the Fund or from Rusch.

About a week later, on February 3, 2005, the Rollins and the Forzani family trusts each invested $122,500 with CFI, with the understanding that it would be invested in the Larocca note and deed of trust. Rollins/Forzani Decl., p. 1–2 [AP Docket No. 29]. It is undisputed that the $245,000 from Rollins and Forzani were deposited in CFI's escrow account. CFI's Incremental Loan Distribution indicates that Rollins and Forzani's investment replaced the $245,000 previously invested by the Fund. Rollins Supp. Decl., Ex. D [AP Docket No. 45]. However, there is no evidence that CFI transferred any money to the Fund as a return of its investment upon receiving funds from Rollins and Forzani and, typically by 2005, no such transfers were made. Judd Decl., ¶ 24 [AP Docket No. 42].

On February 7, 2005, CFI wrote to Rollins and Forzani acknowledging their investments and providing them with copies of: an unsigned Loan Servicing Agreement, an unsigned Lender/Purchaser Disclosure Statement, a Promissory Note signed by Larocca in favor of CFI, a Deed of Trust signed by Larocca in favor of CFI and recorded February 1, 2005, a Certificate of Property Insurance showing that Larocca had insured the property, Larocca's Uniform Residential Loan Application, and a Borrowers' Certification and Authorization authorizing CFI to verify information in Laroccca's loan application. Rollins/Forzani Decl., p. 1–2 [AP Docket No. 29]. The February 7 packages also contained an unsigned Promissory Note

Endorsement as well as an unsigned and unrecorded Assignment of Deed of Trust from CFI to Rollins and Forzani. *Id.,* Ex. E and G [AP Docket Nos. 32 and 33]. According to Rollins and Forzani, even though they were provided with blank copies of the fractional Assignments of Deed of Trust, Nilsen assured them that he would properly record the assignments. *Id.* at p. 2 [AP Docket No. 29].

Between February 16, 2005 and April 30, 2005, CFI's loan distribution history shows several draws on the loan, totaling $221,963.47, which are characterized as construction draws. Rollins Supp. Decl., Ex. D [AP Docket No. 45]. While interest immediately began to accrue on the loan with the first payment due on March 1, 2005, Larocca did not make any monthly interest payments during the first twelve months of the loan. Instead, an amount equal to his monthly interest payment was added to the outstanding loan balance each month. *Id.* Despite Larocca's lack of interest payments, CFI began paying interest to all the Larocca note investors on March 1, 2005 and continued the payments each month thereafter until March 2008. *Id.,* Ex. E [AP Docket No. 45].

By the end of April 2005, the outstanding loan balance reflected in CFI's mortgage records was nearly $245,000 between the construction draws and accruing interest. *Id.,* Ex. D. CFI's mortgage records contain an entry indicating that the Fund provided an additional $100,000 for use by Larocca on April 29, 2005. *Id.* About this time, Nilsen asked Rollins and Forzani to increase their investment in the Larocca loan by $100,000, with each advancing half of that amount. Rollins/Forzani Decl., p. 2 [AP Docket No. 29]. Rollins and Forzani agreed and, in return, they received copies of an undated Modification to the Promissory Note signed by Larocca executed in favor of CFI, and a Notice of Advance

under Deed of Trust, recorded on May 23, 2005 that reflected the additional $100,000 that Larocca owed to CFI. *Id.* Rollins and Forzani also received letters from CFI dated June 6, 2005, acknowledging receipt of their additional $50,000 investments and again providing unsigned copies of updated Lender Servicing Agreements and Lender/Purchaser Disclosure Statements. Sometime later, Rollins and Forzani also received revised Lender Identifications, as well as updated, but still unsigned, Promissory Note Endorsements and Assignments of Deed of Trust that set forth their percentage interest in the now $400,000 Larocca loan. *Id.* No banking records confirm the transfer of $100,000 from the Fund to CFI or any repayment to the Fund upon receipt of the $100,000 from Rollins and Forzani.

By the end of June 2005, CFI's disbursement history reflects that construction draws and accruing interest payments overdrew the funds available for the Larocca loan. The overdrawn status continued into September 2005 when the negative available balance totaled over $145,000. Rollins Supp. Decl., Ex. D [AP Docket No. 45]. Then, Forzani and Rollins were asked to contribute additional funds to bring the Larocca loan to a total of $500,000. Forzani responded by individually placing an additional $50,000 with CFI and his sister, Joanne Forzani, provided another $50,000. Rollins did not invest further. Rollins/Forzani Decl., p. 2 and 4 [AP Docket No. 29]. From CFI, Forzani received copies of an undated Modification of the Promissory Note in favor of CFI raising the total principal to $600,000, and a Notice of Advance under Deed of Trust reflecting a new $600,000 total with CFI as beneficiary that was recorded on September 28, 2005. *Id.* at p. 4. Although Forzani was unaware of who provided funds to increase the loan to $600,000 rather than the $500,000 dis-

cussed with Nilsen, CFI's records assign the additional $100,000 to the Fund. Rollins Supp. Decl., Ex. D [AP Docket No. 45]. Forzani also received an unsigned Loan Servicing Agreement for Joanne Forzani, an updated Lender/Borrower Disclosure Statements reflecting the Forzanis' additional investments in the Larocca note and deed of trust. He further received copies of a Promissory Note Endorsement and an Assignment of Deed of Trust that, again, were neither executed nor recorded. Rollins/Forzani Decl., p. 4 [AP Docket No. 29].

During late 2005 and early 2006, activity on the Larocca loan was primarily characterized by the accrual of interest which continued to be added to the outstanding loan balance. By March 2006, the available loan balance was again overdrawn. Rollins Supp. Decl., Ex D [AP Docket No. 45]. That month, CFI's funding and disbursement history indicates that Larocca made his first monthly interest payment of $7,000. *Id.* While Larocca made nine monthly interest payments over the course of the year, whenever Larocca missed an interest payment, the accrued interest was simply added to the outstanding loan balance recorded on CFI's books. *Id.* That available loan balance was consistently overdrawn from March 2006 forward. *Id.*

On September 7, 2006, CFI agreed to subordinate the $300,000 Larocca loan to a new $700,000 loan with an unidentified lender that apparently would take out the prior first deed of trust. Request for Judicial Notice of Subordination Agreement [AP Docket No. 43]. Because CFI had not properly transferred fractionalized interests in the Larocca loan to the plaintiffs, it was able to enter the Subordination Agreement without plaintiffs' consent, or even their knowledge. CFI's mortgage records reflect the subordination transaction as follows: there was a "principal paydown" of

$100,637.40 that apparently reimbursed the Fund for its $100,000 investment from a year earlier. *Id.* The paydown, however, increased the overdrawn loan balance to $108,552.40. This activity is followed by a corresponding deposit from "First American Title" of $108,552.40, to zero out the available loan balance. CFI's Incremental Loan distribution does not contain any entry related to the deposit from "First American Title." *Id.*

In February 2007, the balloon payment of principal and interest on the Larocca note became due. Instead of making that balloon payment, Larocca stopped making any payments on his loan. *Id.;* Judd Decl., ¶ 13 [AP Docket No. 42]. As a result, Larocca's negative available balance increased steadily through April 2008. Rollins Supp. Decl., Ex D [AP Docket No. 45]. By contrast, CFI's incremental loan distribution records reflect that the Fund contributed an additional $70,000 toward the Larocca loan during November and December 2007. *Id.,* Ex. C. Then, in February 2008, CFI's investment history indicates that the Fund bought out the $55,000 principal investment of Peter Rusch, the original individual investor, and invested another $34,000 bringing the total amount of the loan to $604,000. *Id.,* Ex. D.

In May 2008, Rollins requested information concerning his investment with CFI. In response, CFI sent Rollins a Payment History for the Larocca loan through August 2007. Rollins Decl., p. 3 and Ex. S [AP Docket Nos. 29 and 38]. This history is inconsistent with CFI's loan payment and disbursement records because the payment history sent to Rollins indicates that Larocca regularly paid the interest due on the loan through August 2007. The history sent to Rollins also noted that, without Rollins's knowledge, there had been a $100,000 principal pay down in September 2006. When Rollins asked Nil-

sen's son for an explanation of the principal paydown, he learned that the holder of the first deed of trust paid Nilsen $100,000 to subordinate the Larocca deed of trust to the first deed of trust. Rollins/Forzani Decl., p. 2–3 [AP Docket No. 29].

On May 12, 2008, Rollins demanded a copy of the Assignment of Deed of Trust that he believed had been recorded in his favor years earlier. Shortly thereafter, he received a copy of an Assignment of Deed of Trust in connection with the Larocca loan that had just been recorded on May 16, 2008. Rollins Decl., p. 3 [AP Docket No. 29]. The assignment reflected each plaintiff's then current percentage interests in a second deed of trust commensurate with each of their investment totals based on a total loan of $604,000. Rollins was surprised to learn that the investment total related to the Larocca loan was $604,000 and that CFI claimed a fractionalized interest based on a $7,000 investment and the Fund claimed a fractionalized interest based on a $152,000 investment. *Id.*

After the holder of the first deed of trust filed a notice of default, Rollins and Forzani purchased the first deed of trust. Rollins believes that Larocca has abandoned the property and has no intention of curing any defaults due to lack of equity. *Id.*

On May 26, 2008, less than ninety days after the deed of trust assignment in favor of Rollins and Forzani was recorded, CFI filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Shortly thereafter, several creditors and the United States Trustee requested the appointment of a chapter 11 trustee to administer CFI's estate. Over CFI's objection, the court granted the requests and R. Todd Nielson was appointed trustee.

Immediately upon his appointment, the trustee initiated efforts to gain access to and evaluate CFI's records and loan portfolios, but he encountered roadblocks from the outset. The day after his appointment, the trustee filed an emergency motion to gain access to a computer server containing CFI's books and records. [Main Case Docket No. 66]. Nilsen had removed it from CFI's business premises. By the time it was returned, over 600 files had been deleted. First Status Conference Statement of R. Todd Nielson, p. 2–3 [Main Case Docket No. 95]. Even after the server was returned, it was apparent to the trustee that CFI had failed to keep adequate business records. Nielson Decl. ¶¶ 5–7 [Main Case Docket No. 85–1]. The electronic and paper files were disorganized and incomplete. First Status Conference Statement of R. Todd Nielson, p. 3 [Main Case Docket No. 95]. The trustee embarked on what he believed would be a project of several months to compile the information needed to evaluate CFI's business operations. Nielson Decl. ¶ 5–7 [Main Case Docket No. 85–1]. From June through December 2008, Judd, and others working under his supervision, engaged in a file by file analysis of each of the 163 loans that were in CFI's portfolio on the day it filed from bankruptcy.

### DISCUSSION

### I. *Questions of Fact Regarding CFI's Intent Preclude Summary Judgment in Plaintiffs' Favor.*

■ To succeed on their claim for an equitable lien as a matter of law, plaintiffs must establish that 1) they have no adequate remedy at law, 2) CFI is indebted to plaintiffs, 3) there is identifiable property against which the debt could be charged, and 4) all parties to the transaction intended that the identified property would serve as security for the debt. 51 Am.Jur.2d Liens § 34 (2008). The first three ele-

ments are not disputed. The record establishes that Rollins placed $172,500, D. Forzani placed $222,500 and J. Forzani placed $50,000 with CFI for investment in the Larocca note and deed of trust. CFI has never repaid those investments. Plaintiffs have no adequate remedy at law because CFI is insolvent and does not have sufficient funds to pay its debts in full. Finally, according to unsigned loan documents submitted with their motion, plaintiffs' investments were to be secured by a second deed of trust against the Larocca property. Thus, the Larocca property serves as an "identifiable property" against which the debt could be charged.

Nevertheless, the final, critical element of intent remains subject to dispute and precludes summary judgment in plaintiffs' favor. Intent is an inherently fact laden inquiry that does not lend itself to summary judgment. *In re Wills,* 243 B.R. 58, 65 (9th Cir.BAP1999). To establish intent, plaintiffs urge that Nilsen sent them a letter acknowledging their investment and, although the enclosed documents were unsigned, that he personally assured them that he would record their interest in the Larocca deed of trust. They further point to CFI's computerized mortgage records which contain entries indicating that plaintiffs' funds were assigned to the Larocca loan and reflect that plaintiffs were sent interest payments based on their percentage investment in the Larocca loan. Based on this evidence, plaintiffs assert that there was an agreement between the parties that the Larocca property would be security for their investment and that CFI and Nilsen performed in accordance with that agreement. The trustee, however, contends that CFI never intended to assign a portion of the Larocca Note and Deed of Trust to the plaintiffs. In support of that contention, he points to evidence inconsistent with an intention to make the Larocca property security for the plaintiffs' investment. First, despite CFI's earlier practice of properly documenting and recording fractionalized interests, Nilsen did not record, or even sign, any of the documents need to create the plaintiffs' security interest until May 2008 when he faced pressure from state court lawsuits and state regulators who were auditing CFI. Moreover, in the years following plaintiffs' investment but before the recording of their interest, Nilsen took advantage of the fact that the entire note and deed of trust remained in CFI's name. Specifically, in September 2006, Larocca refinanced his first deed of trust with a new $700,000 loan secured against his property. As part of that transaction, and without plaintiffs' knowledge or consent, CFI subordinated the $300,000 Larocca deed of trust to the new loan.

Plaintiffs' attempt to explain away the trustee's evidence is ineffective because the trustee's evidence and all reasonable inferences from that evidence must be construed in the trustee's favor. One reasonable inference from the failure to sign a note endorsement or an assignment of deed of trust, especially when CFI's prior course of conduct suggests that Nilsen knew they were necessary, is that Nilsen never intended to sign those documents and only did so when the DRE forced his hand several years down the road. Additionally, it makes no difference that plaintiffs would have agreed to the 2006 subordination if they had been asked. The fact remains that CFI's unilateral subordination of the loan is entirely inconsistent with plaintiffs' fractionalized interest. As a result, there remains a question of fact regarding CFI's intent to use the Larocca property as security for plaintiffs' investment, precluding summary judgment in favor of plaintiffs.

## II. *The Larocca Property Is Not Subject To A Resulting Trust.*

Alternatively, plaintiffs use the evidence that the parties agreed to and intended to create a security interest in the Larocca property to oppose the trustee's motion for summary judgment. They assert that they are entitled to an "equitable lien by agreement," which makes the trustee's evidence of mismanagement irrelevant. According to plaintiffs, equitable liens by agreement arise to enforce an agreement regarding ownership of property. They are the same as and interchangeable with resulting trusts. Like a resulting trust, plaintiffs urge, their interest in the Larocca property should be recognized regardless of tracing issues and without consideration of countervailing equities created by the Bankruptcy Code's policy of ratable distribution. However, the foundation of plaintiffs' position—that equitable liens and resulting trusts are interchangeable—is mistaken.

### A. Equitable Liens and Resulting Trusts Are Separate and Independent Remedies.

Under California law, a resulting trust arises when a transfer of property takes place under circumstances showing that no one intended for the transferee to take a beneficial interest in the transferred property. 10 Witkin, SUMMARY OF CALIFORNIA LAW, Trusts § 311 (10th ed.2005). It is enforceable in equity to carry out the inferred intent of the parties to establish a trust. For example, parties might transfer property with intent to establish a trust relationship, but for some reason the transaction falls short of creating an express trust. Under those circumstances, courts can use their equitable power to recognize a resulting trust. Property that a debtor holds subject to a resulting trust never becomes part of that debtor's bank-

ruptcy estate because the debtor took the property as a trustee and never held more than bare legal title with the full beneficial interest residing in the beneficiary. *In re Unicom Computer Corp.*, 13 F.3d 321, 324 (9th Cir.1994); *In re Golden Triangle Capital, Inc.*, 171 B.R. 79, 83 (9th Cir. BAP1994).

An equitable lien, by contrast, is not a trust and does not create one. *New v. New*, 148 Cal.App.2d 372, 381, 306 P.2d 987 (1957). It is not even a right to claim ownership of property. 51 Am.Jur.2d Liens § 31 (updated 2008). It is merely a remedial right, enforceable in equity, to have certain identified property applied to pay a debt. Bogert, *Trusts and Trustees*, § 32 (updated 2008). Plaintiffs are correct that there are two categories of equitable liens, those used to give effect to the parties' agreement or intention and those imposed because equity demands it despite the absence of intent or even evidence of contrary intent. Nevertheless, all equitable liens are founded on the fact that title to the property has passed to the debtor holding the property. *Id.* The equitable lien is merely a judicial recognition that, in the interest of fairness, whether by agreement or not, the property at issue should be used to satisfy a debt owing to the party seeking the lien. Until the court acts, an equitable lien is no more than a "floating" equity unattached to any particular property. *Id.; New*, 148 Cal.App.2d at 381, 306 P.2d 987. *See also* 51 Am. Jur.2d Liens at § 32.

While both resulting trusts and equitable liens by agreement arise out a similar belief that equity can be used to fulfill the intent of the parties, it is clear that they are two distinct concepts. In the bankruptcy context, their differences are critical in determining whether the bankruptcy policy of ratable distribution among creditors takes precedence. Because a re-

sulting trust is a judicial recognition that the parties' relationship is and was always intended to be that of trustee and beneficiary, not debtor and creditor, the trust property never belongs to the debtor and does not become part of the bankrupt's estate. *Unicom,* 13 F.3d at 324; *Golden Triangle,* 171 B.R. at 83. Without the debtor-creditor relationship, the policy of ratable distribution, or treating all *creditors* equally, never comes into play and cannot outweigh the imposition of the resulting trust. *See Golden Triangle,* 171 B.R. at 82–83. By contrast, when a trust is imposed as a remedy for a claim, as with constructive trusts, generally a credit relationship will exist between the claimant and the debtor. As a result, the claimant/creditor's right to have a constructive trust imposed is subject to the policy of ratable distribution. *Id.* (collecting cases).

▇▇ Applying this same analysis to equitable liens, it is apparent that the imposition of an equitable lien, whether by agreement or not, should also be subject to the bankruptcy policy of ratable distribution. An equitable lien represents the right to have a specific asset used to satisfy a debt between the parties. Because a debtor-creditor relationship lies at the heart of this remedy, the principles of ratable distribution are considered in determining whether to impose the lien.

### B. The Evidence Before the Court Fails to Establish Intent to Enter A Trust Relationship

▇▇ A resulting trust does not arise unless both parties to the transaction intended that the holder of the property was to hold it in trust for the other. Evidence to support the declaration of a resulting trust must be clear and convincing. *G.R. Holcomb Estate Co. v. Burke,* 4 Cal.2d 289, 299, 48 P.2d 669 (1935); *Johnson v. Johnson,* 192 Cal.App.3d 551, 556, 237 Cal.Rptr. 644 (1987). On the record before me, there is no evidence much less clear and convincing evidence, that either CFI or the plaintiffs intended to enter into a trust relationship. Even when construed in plaintiffs' favor, the intent of the transaction was to provide plaintiffs with security for recouping the investment they placed with CFI. Intent to establish a security interest rather than a trust, is not a sufficient basis to impose a resulting trust to remedy the failure to perfect the security interest. *In re Foam Systems Co.,* 92 B.R. 406, 409 (9th Cir.BAP1988), *aff'd,* 893 F.2d 1338, 1990 WL 1415, at *3 (9th Cir. Jan.12, 1990)(no resulting trust imposed against bank account representing advance payment of supply contract where express intent between debtor and surety company was that surety would have lien against the account for any monies it paid if the debtor failed to fulfill the contract).

### C. The Circumstances of this Case Dictate That Ratable Distribution Outweighs Any Right to an Equitable Lien.

▇▇▇ Because any right to have an equitable lien imposed against the Larocca property is an inchoate equitable remedy, caution is required before exercising that equitable power. *In re North American Coin & Currency, Ltd.,* 767 F.2d 1573, 1575 (9th Cir.1985). The effect of the remedy must be weighed against bankruptcy's policy of ratable distribution among all creditors to determine whether its use would be consistent with bankruptcy law. *Id.* While the trustee bears the burden of proving that the imposition of an equitable lien would be inequitable, the undisputed evidence makes it clear that recognizing a lien in plaintiffs' favor is inappropriate.

It is not disputed that CFI primarily operated through its escrow account at

Wells Fargo Bank. Within the escrow account, CFI commingled investments from individual investors and the Fund along with payments received from borrowers and other sources. It is also undisputed that when the escrow account ran short of funds, Nilsen simply transferred money into it from one of his other accounts, primarily the Fund's subscription account. This commingling of funds from various sources makes it impossible to trace deposits into the escrow account to their ultimate use or destination. While plaintiffs' investments went into the escrow account, there is no available evidence to show whether their money was used to make interest payments that were due on various loans that month or whether it was actually applied to the Larocca loan.

Plaintiffs urge that it makes no difference how the dollars in the escrow account were applied. It is enough, they contend, to establish that their investments went into the escrow account and that the parties had agreed to a lien in favor of the plaintiffs. However, the law does not allow this because, under the particular circumstances of this case, the potential exists for competing equitable claims to the same property. For example, CFI's mortgage records indicate that the Fund was one of two original investors in the Larocca loan. Before the Fund's investment was released to CFI, CFI should have, but failed to provide a fractionalized note endorsement and assignment of deed of trust in favor of the Fund. Then, CFI solicited and received the plaintiffs' investment. Although the mortgage records contain an entry that plaintiffs' investment replaced that of the Fund, there is no evidence that the Fund ever received money back as the plaintiffs bought out the Fund's interest. Absent the ability to trace how the money in the escrow account was applied, it is impossible to determine the relative merits of potentially competing equitable claims

to the Larocca property. As a result, the imposition of an equitable lien in favor of any particular claimant would be unfair and inconsistent with the Bankruptcy Code's strong policy in favor of treating all creditors equally.

### III. Undisputed Evidence of Improper Business Practices Precludes the Application of § 541(d) to Exclude Plaintiffs' Fractionalized Interest From Property of the Estate.

Section 541(d) of the Bankruptcy Code provides that property in which the debtor holds only legal title and not an equitable interest becomes property of the estate only to the extent of that legal title. 11 U.S.C. § 541(d). The statute describes, as an example, the sale of an interest in a mortgage where the debtor retains legal title to service the mortgage. *Id.* In enacting § 541(d), however, Congress only intended to protect "bona fide secondary mortgage market purchases and sales." *See Corporate Financing, Inc. v. Fidelity National Title Insur. Co. Of New York (In re Corporate Financing, Inc.),* 221 B.R. 671, 681 (Bankr.E.D.N.Y.1998); *Colin v. Fidelity Standard Mortgage Corp. (In re Fidelity Standard Mortgage Corp.),* 36 B.R. 496, 499 (Bankr.S.D.Fla.1983). In light of that limitation, courts have been unwilling to apply § 541(d) to exclude property from a debtor's estate where evidence of fraud, or even evidence of poor business practices, demonstrates that a transaction falls short of being "bona fide." *Corporate Financing, Inc.,* 221 B.R. at 681 (presumption that seller in secondary mortgage market retains legal title only is rebutted in light of poor business practices or fraud); *Ables v. Major Funding Corp. (In re Major Funding Corp.),* 82 B.R. 443, 448–449 (Bankr.S.D.Tex.1987)(§ 541(d) creates presumption that broker retains legal title only, but presumption is rebuttable based on evidence of bad business practices or fraud); *Lemons & Associates,*

*Inc. v. Boone (In re Lemons & Associates, Inc.)*, 67 B.R. 198, 210–11 (Bankr.D.Nev. 1986)(§ 541(d) creates trust-like relationship between broker and investors which may be disregarded when bad business practices or fraud precludes proper identification of the trust res); *Fidelity Standard*, 36 B.R. at 500 (court should consider whether mortgage assignment has purpose outside of the necessities of the secondary mortgage market). Business practices that have led courts to find that transactions should not be protected by § 541(d) include the commingling of investor funds into one general operating account rather than establishing separate accounts. *In re Sprint Mortgage Bankers Corp.*, 164 B.R. 224, 229 (Bankr.E.D.N.Y.1994). Another important factor includes the use of new investments to pay interest to senior investors. *Corporate Financing*, 221 B.R. at 681.

On the record before the court, the undisputed evidence of bad business practices is overwhelming. There is no dispute that CFI commingled not only investor funds, but also borrower payments on the various loans. From those commingled funds, CFI paid its investors a steady stream of interest on their investments, regardless of whether the borrower on the underlying note and mortgage was making payments due on the note. It is also undisputed that CFI failed to properly document and record the fractionalized interests of its investors. This failure cannot be characterized as merely careless or as intended to facilitate the secondary mortgage market. The evidence shows that, until 2004, CFI properly documented the interests of its investors. It is apparent that CFI knew proper documentation was necessary and knew how to complete it. Moreover, in 2005, the DRE disciplined Nilsen for CFI's failure to record assignments of deeds of trust in the investors' names. Despite that disciplinary action, CFI did not correct these deficien-

cies. CFI also took advantage of the lack of proper documentation. It subordinated some investors' interests, including the plaintiffs, without their knowledge. The record further demonstrates that CFI often used the Fund as a source of cash without regard to the Fund's actual investment in mortgage interests. Money was transferred between CFI and the Fund on an "as needed" basis. CFI listed the Fund as 100% owner of virtually every loan that CFI originated regardless of the Fund's actual level of investment and without any note endorsements or assignments to establish the Fund's interest. As other fractionalized investors provided funds, CFI simply reduced the Fund's fractionalized interest that was recorded in CFI's mortgage records to reflect the unsold portion of the note and mortgage. The Fund did not receive money back as its 100% interest was re-sold.

Whether these practices and others rise to the level of fraud or only gross mismanagement makes no difference. The key consideration is whether the business practices furthered the secondary mortgage market. The prevalence of the bad practices evidenced in the record can leave no doubt that CFI's operations hindered rather than facilitated legitimate secondary mortgage market transactions. On this record, as a matter of law, plaintiffs are not entitled to the protection afforded by § 541(d).

### CONCLUSION

Although plaintiffs' complaint survived dismissal, I warned plaintiffs of the difficult issues of proof that they would have to overcome. At this juncture, questions of fact related to intent prevent the recognition of an equitable lien as a matter of law. However, even if the elements of an equitable lien had been established, the undisputed gross mismanagement of CFI produced extensive commingling and misuse of investor funds, which, in turn, has creat-

ed the potential for competing equitable claims against the Larocca property. The totality of the circumstances presented make it inappropriate to exercise this court's equitable powers to recognize a lien in favor of any particular creditor. It is also apparent from the record that the manner in which CFI's business was conducted precludes reliance on § 541(d) to exclude plaintiffs' interest in the Larocca property from CFI's estate.

For the reasons explained, the plaintiffs' motion for summary judgment is denied and the trustee's counter-motion for summary judgment in his favor and against plaintiffs is granted.

Good cause appearing, IT IS SO ORDERED.